**Lee A. BALAKLAW, Plaintiff–Appellant,**

v.

**Robert M. LOVELL; Wessley D. Stisser; Donald Ames; Joseph Compagni, Jr.; Ronald Denniston; Deborah Geibel; James Gibbs; William Greer; David Hempson; David Hunsinger; Bonnie Innerst; David Lundeen; Dean Mitchell; Gene Nacci; Joan Poskanzer; Charles Spaulding; Connie Swarr; Cortland Memorial Hospital; The C.M.H. Group, Defendants–Appellees.**

No. 395, Docket 93–7484.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1993.

Decided Jan. 26, 1994.

Whitney North Seymour, Jr., New York City, for plaintiff-appellant.

Frances A. Ciardullo, Syracuse (Costello, Cooney & Fearon), for defendants-appellees.

Before: CARDAMONE, McLAUGHLIN, and LAY,* Circuit Judges.

* Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

LAY, Senior Circuit Judge:

Borrowing themes from the Supreme Court's opinions in *Jefferson Parish*[1] and *Summit Health*[2], Dr. Lee A. Balaklaw, an anesthesiologist practicing in Cortland, New York, brought suit under section 1 of the Sherman Act, 15 U.S.C. § 1 (1988),[3] and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1988),[4] for an alleged "group boycott" and unreasonable restraint of trade preventing him from rendering anesthesiology services at Cortland Memorial Hospital ("CMH" or "the Hospital"). Balaklaw, rather than asserting a claim of an illegal tie-in, as Dr. Hyde did in *Jefferson Parish*, or alleging an illegal disciplinary-review process as Dr. Pinhas had in *Summit Health*, urges that CMH violated the Sherman Act by entering into an exclusive contract with a group of anesthesiologists of which Dr. Balaklaw was not a member. Dr. Balaklaw alleges a conspiracy among the hospital, the successful bidding group of anesthesiologists (the "King group"), and others.[5] The district court[6] rejected these claims, and we affirm.

## I. BACKGROUND

Prior to the commencement of this lawsuit, Dr. Balaklaw served as president of Anesthesia Associates of Cortland, P.C., ("AAC") a private physicians' group, and Chief of Cortland Memorial Hospital's Department of Anesthesiology. Although there was no written contract governing the relationship between AAC and the Hospital, the entire Department of Anesthesiology consisted of AAC members, and AAC was solely responsible

1. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Jefferson Parish*, an anesthesiologist was denied admission to the defendant hospital's medical staff because the hospital had entered into an exclusive contract with a firm of anesthesiologists requiring that all anesthesiology services for the hospital's patients be performed by the contracting firm. *Id.* at 7, 104 S.Ct. at 1555. The rejected doctor sued under § 1 of the Sherman Act on the grounds that the users of the hospital's operating rooms were compelled to purchase the hospital's anesthesiology services, and that as such, an illegal "tying arrangement" existed. *Id.* at 4–5, 104 S.Ct. at 1554. The court of appeals agreed, finding the contract to be a *per se* violation of the Sherman Act. *Id.* at 8, 104 S.Ct. at 1556. The Supreme Court reversed and held that even though the patients were required to purchase two services that would otherwise be purchased separately, there was no illegal tying arrangement or violation of the Sherman Act because there was no restraint on competition. *Id.* at 32, 104 S.Ct. at 1568. Justice Stevens concluded for the Court that "[w]ithout a showing of actual adverse effect on competition" there could be no case under the antitrust laws. *Id.* at 31, 104 S.Ct. at 1568.

2. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The plaintiff in *Summit Health*, an ophthalmologist, asserted that the defendant hospital and its medical staff had violated § 1 of the Sherman Act by conspiring to drive him out of business in order to increase their competitive market share. *Id.* at ——, 111 S.Ct. at 1844. The plaintiff alleged that the conspirators used sham professional peer-review proceedings to terminate his privileges and that they took other measures to prevent him from obtaining work elsewhere. *Id.* at ——–——, 111 S.Ct. at 1845–46. The Court held that the claim satisfied the interstate commerce requirement of federal antitrust jurisdiction, and its analysis indicated that the offense charged would violate the Sherman Act. *Id.* at ——–——, 111 S.Ct. at 1848–49.

3. Section 1 of the Sherman Act provides, in pertinent part, that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988 & Supp. IV 1992).

4. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15 (1988). Section 16 in part allows "[a]ny person, firm, corporation, or association ... to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26 (1988).

5. Defendants include Cortland Memorial Hospital, Inc.; the C.M.H. Group, Inc., the Hospital's corporate parent; Robert M. Lovell, the hospital administrator and its chief executive officer; and members of the Hospital's Board of Trustees. Dr. Delf King, head of the King group, was named as a co-conspirator but not as a defendant to this action.

6. The Honorable Frederick J. Scullin, Jr., United States District Judge for the Northern District of New York.

for meeting the Hospital's anesthesia requirements. AAC had what the district court described as a "*de facto* exclusive contract with the Hospital." Plaintiff rejects this characterization, testifying that throughout this period, any qualified competitor "could have come in from the outside and competed with us at any point in time."

Dr. Balaklaw's arrangement with CMH came to an end when CMH decided to solicit proposals from outside for a written exclusive contract for anesthesiology services.[7] CMH sent a formal Request for Proposals to practicing anesthesiologists in New York, Vermont, Massachusetts, Connecticut, New Jersey, Pennsylvania, and Ohio. Nine proposals were received in return, including one from AAC. An ad hoc selection committee consisting of members of the Board of Trustees, Hospital administration, and medical and nursing staffs then interviewed four of the applicant groups, including the group headed by Dr. Balaklaw. The committee unanimously recommended that the Board award the exclusive contract to a group headed by Dr. Delf King, and the Board of Trustees subsequently announced its intent to enter into such a contract.

Pursuant to the Hospital's Medical Staff By-Laws, Dr. Balaklaw sought a hearing to review this decision. The hearing committee unanimously supported the Board's intent to award the contract to Dr. King, and on appeal the full Board upheld the hearing committee's decision. The Hospital then executed a formal written agreement with Dr. King.

Under the terms of the contract, Dr. King and his group became the exclusive providers of anesthesia services to all patients at CMH. The initial term of the contract was three years, but either party could terminate the contract without cause upon six-months' notice. Dr. Balaklaw's clinical privileges were

not terminated. He asserts, however, that the nature of the contract effectively ousted him from his practice at CMH and that because other hospitals request information about any prior diminutions in privileges, he has been rendered unable to secure another full-time position.

The complaint alleges that the Hospital's and Dr. King's actions in entering into the exclusive anesthesiology contract constituted a conspiracy to engage in an illegal group boycott of, and a concerted refusal to deal with, Dr. Balaklaw. Dr. Balaklaw claims that he has been driven from the practice of his profession, not only at CMH, but nationwide. He alleges that the proceedings that led to the contract between CMH and Dr. King were anti-competitive and a *per se* violation of the Sherman Act. As compensation, Dr. Balaklaw seeks treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and declaratory and injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26.

The district court held that the plaintiff lacked standing to assert his antitrust claims. The court reasoned that the injury plaintiff alleged did not appear "to be the type of injury the antitrust laws were intended to prevent." In addition, the court held that even if the plaintiff did possess the requisite standing, summary judgment for the defendants would still be warranted because the plaintiff had not established the substantive elements of his claims. The court concluded that CMH's effort to change the anesthesia services at CMH did not hinder competition, but rather, it fostered it by awarding the contract to the organization that offered to provide the services needed by the Hospital at the lowest price. The court thus entered its order granting defendants' motion for summary judgment, from which the plaintiff appeals.[8]

7. The parties dispute the reasons for this decision. Dr. Balaklaw contends that he had become "the target of an economic vendetta" at CMH because of "years of independent, reform-minded patient advocacy." Defendants claim that the Board of Trustees was motivated by "many complaints about inadequate anesthesia services from members of its Medical Staff."

8. In addition, the district court found no actionable conspiracy between the hospital and members of its medical staff because they constituted a single entity for purposes of antitrust litigation. The court likewise rejected a conspiracy theory based simply on the fact that Dr. King and his group had entered into a contract with the hospital. The court further found there was no unreasonable restraint of trade or *per se* violation of the Sherman Act. In this regard, the court

We affirm the district court's dismissal of the complaint for lack of standing.

## II. DISCUSSION

■ It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury. *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 250 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir.1991). "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *see R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). This antitrust injury requirement underscores the fundamental tenet that "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe v. United States,*

370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

■ It follows from the purposes of the antitrust laws that injuries resulting from competition alone are not sufficient to constitute antitrust injuries. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 334.2 (Supp.1993). Thus, in *Brunswick,* the Supreme Court found no antitrust injury where the defendant had preserved, rather than dampened, competition by acquiring a number of the plaintiff's bowling alley competitors that would otherwise have gone out of business. 429 U.S. at 488, 97 S.Ct. at 697. The Court responded to the plaintiff's claim that the defendant's actions deprived it of profits it would have received had its competition been allowed to fail by stating, "It is inimical to the purposes of [the antitrust] laws to award damages for the type of injury claimed here." *Id.; see also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 116–117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986) (extending antitrust injury requirement to equitable actions under section 16 of the Clayton Act and stating that "the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury").

In the case before us, even if we assume that the plaintiff suffered a direct and readily identifiable injury caused by the defendants' actions, there is no evidence that this injury was "of the type the antitrust laws were intended to prevent." [9] We agree with the

found that the relevant market area for anesthesiologist services was nationwide. The court found no evidence that the contract foreclosed competition within this market.

9. The Court in *Cargill* pointed out that even an antitrust injury, while necessary to establish standing under section 4 of the Clayton Act, may not always be sufficient to confer standing, "because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." 479 U.S. at 110 n. 5, 107 S.Ct. at 489 n. 5. In *Associated General,* the Court discussed some of the "other reasons" that might affect whether a party has antitrust standing. *See* 459 U.S. at 537–45, 103 S.Ct. at 908–12. The Court mentioned: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the

antitrust laws; (4) the directness of the connection between the injury and alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages. *Id.; see South Dakota v. Kansas City Indus.,* 880 F.2d 40, 45–46 (8th Cir.1989) (analyzing and applying these factors), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990).

Over time, courts have developed a two-pronged analysis to determine whether a plaintiff has antitrust standing. As a necessary first step, courts must determine whether the plaintiff suffered an antitrust injury. If the answer to that question is yes, they must then determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws. *See Todorov,* 921 F.2d at 1449. In this appeal, since we conclude

district court that Dr. Balaklaw's claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contract at CMH, and nothing more.

## A. Exclusive Dealing

Dr. Balaklaw claims that the exclusive contract between CMH and the King group led to an antitrust injury because it "unreasonably foreclose[d] a significant amount of competition in the relevant market without pro-competitive justification." We disagree. The Supreme Court in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), disposed of a similar argument on the merits. The Court observed with respect to an exclusive contract between the defendant hospital and an anesthesiology group headed by Dr. Kermit Roux:

> There is . . . insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained competition. The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. The evidence indicates that some surgeons and patients preferred respondent's services to those of Roux, but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.
>
> In sum, all that the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges. Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges. If respondent is admitted to the staff of East Jefferson, the range of choice will be enlarged from four to five doctors, but the most significant restraints on the patient's freedom to select a specific anesthesiologist will nevertheless remain.

*Id.* at 29–31, 104 S.Ct. at 1567–68 (footnotes omitted). We reach a similar assessment of the allegations here.

The relevant markets even arguably affected by the exclusive contract granted to Dr. King and his group are (1) the consumers of anesthesiology services, and (2) the providers of anesthesiology services. *See Jefferson Parish*, 466 U.S. at 7, 104 S.Ct. at 1555. From the consumers' point of view, nothing about the market has changed. As the Tenth Circuit noted on similar facts in *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388 (10th Cir. 1992), "it is clear that what occurred after the implementation of the [exclusive] contract . . . was only a reshuffling of competitors," *id.* at 1393.[10] Although Dr. Balaklaw claims that other qualified competitors could have come in from the outside at any time to compete with him and his group, the evidence shows that prior to the agreement with Dr. King, Dr. Balaklaw's group had exclusive control over anesthesiology services at CMH.[11] *Cf. Jefferson Parish*, 466 U.S. at 6,

---

that Dr. Balaklaw has not suffered an antitrust injury, we do not reach this second question.

10. In *Coffey*, as here, the plaintiff group of physicians once had an exclusive, though not always written, arrangement with a hospital to provide, in that case, radiological services, but was replaced when the hospital entered into an exclusive contract with another group. 955 F.2d at 1390. The court affirmed summary judgment granted against the plaintiffs. *Id.* at 1395.

11. The evidence also suggests that prior to CMH's entering into the contract with Dr. King, Dr. Balaklaw strongly supported the "single group" concept. He spoke at meetings and wrote three separate memoranda to the Board of Trustees endorsing the view that the Hospital should have only one anesthesia group providing anesthesia services to patients. On appeal, he argues that he never advocated an exclusive contract; rather, "[w]hat he advocated was administration of the department by a single group— with no express restriction on membership." We find this a distinction without a difference. Whether "administered" by a single group or contractually delegated to a single group, the department would not be freely open to non-group members or other, competing groups. Additional doubt is cast on Dr. Balaklaw's willingness to operate the department "with no restrictions on membership" by the fact that, as he

104 S.Ct. at 1555 (noting that despite deleting contract clause excluding other anesthesiologists from practice, hospital continued to regard itself as committed to a closed anesthesiology department). After CMH entered into the agreement with Dr. King, anesthesiology services remained exclusive. Only the provider changed.

From the standpoint of the providers of anesthesiology services, the market remains similarly unaltered. The relevant market here is the market in which anesthesiologists compete for jobs. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). While the precise dimensions of this market are not clearly defined, "[t]he market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts ... and might be statewide or merely local." *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567 (footnote omitted). The basic principle is that "the relevant market definition must encompass the realities of competition." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir.1991) (en banc), *cert. denied*, — U.S. —, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *see United States v. Grinnell Corp.*, 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966). The evidence shows that in this case, CMH solicited proposals from anesthesiologists in seven states, tangibly indicating that anesthesiologists compete in a multi-state, if not national, market. Plaintiff has provided no evidence that this competition has been hampered by the exclusive contract entered into at CMH. Even if the contract between CMH and Dr. King excluded Dr. Balaklaw from the local Cortland-area market, there is no evidence to suggest that the contract caused Dr. Balaklaw (or other anesthesiologists) to be excluded from, or substantially limited in, the broader market for employment. *See Collins*, 844 F.2d at 479.[12]

Even at CMH, opportunities for competition remain, since the contract with Dr. King has a term of only three years and may be cancelled without cause upon six-months' notice. In *Konik v. Champlain Valley Physicians Hospital Medical Center*, 733 F.2d 1007, 1014–15 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), we rejected an antitrust challenge to an anesthesiology contract in part because the parties were free at the end of any six-month period to terminate the agreement. Here, as there, "the Hospital [is] free at the end of six months to enter into a new arrangement either with [the current group] or with any other anesthesiologist." *Id.* at 1015. Such a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions. *See, e.g., Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1353–54 (7th Cir.1982); *Drs. Steuer & Latham, P.A. v. National Medical Enters., Inc.*, 672 F.Supp. 1489, 1516 (D.S.C.1987), *aff'd*, 846 F.2d 70 (4th Cir.1988) (table). We thus see no "foreclosure of competition" in either of the two relevant markets, and consequently, we find no antitrust injury.[13]

testified at his deposition, he actively enforced non-competition clauses in the employment contracts of Dr. Abbassi and Dr. Jeffrey, former members of Dr. Balaklaw's group, to prevent them from practicing at CMH. Joint App. at A–213—A–214.

**12.** Although this analysis parallels the district court's substantive discussion of the relevant market area, it also is relevant to the failure of the plaintiff to demonstrate a cognizable antitrust injury showing an actual adverse effect on competition. *See Jefferson Parish*, 466 U.S. at 31, 104 S.Ct. at 1568 (noting after analysis of relevant market that "[w]ithout a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made").

**13.** Dr. Balaklaw also alleges that there is no "pro-competitive justification" for the exclusive contract with Dr. King. While such considerations are more relevant to a "rule of reason" analysis on the merits, we note that in addition to the generally pro-competitive effects short-term exclusive contracts for medical services may have, the defendants here did provide "evidence of the pro-competitive 'redeeming virtues' of their combination." *See Capital Imaging v. Mohawk Valley Medical Assocs.*, 996 F.2d 537,

This is not to say that under proper pleading and proof exclusive-dealing contracts could not still be scrutinized under the antitrust laws. As Justice O'Connor expressed in her concurring opinion in *Jefferson Parish:*

> Exclusive-dealing arrangements may, in some circumstances, create or extend market power of a supplier or the purchaser party to the exclusive-dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. In determining whether an exclusive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question—the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal. *Standard Oil Co. of California v. United States,* 337 U.S. 293, [69 S.Ct. 1051, 93 L.Ed. 1371] (1949).

466 U.S. at 45, 104 S.Ct. at 1575–76. In this case, Dr. Balaklaw has alleged no threat of "adverse economic consequences" to anyone but himself.

### B. Group Boycott

▮ Dr. Balaklaw contends that under the Supreme Court's decision in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), CMH's actions constitute a group boycott against him and thus are a *per se* violation of the Sherman Act. He alleges that CMH used its peer review proceedings to "exclude the victim from the entire national market for employment by putting an indelible black mark on the doctor's record."

▮ Group boycotts, which generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms, *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council,* 857 F.2d 55, 73 (2d Cir.1988), may in some limited circumstances constitute *per se* violations of the Sherman Act.[14] *See Capital Imaging v. Mohawk Valley Medical Assocs.,* 996 F.2d 537, 542 (2d Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *see also FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (noting that the *"per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor"). For standing purposes, however, whether there was or was not a *per se* violation is irrelevant. *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989). Regardless of any substantive violation of the Sherman Act, sections 4 and 16 of the Clayton Act still require plaintiffs to establish that the defendants engaged in anticompetitive conduct that caused them an antitrust injury. *Id.; Newman v. Universal Pictures,* 813 F.2d 1519, 1522–23 (9th Cir.1987) ("[A]lthough the *per se* rule relieves plaintiff of the burden of demonstrating an anticompetitive effect, which is assumed, it does not excuse a

---

543 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993) (citation omitted). The evidence shows that the ad hoc advisory committee chose to recommend an exclusive contract with Dr. King's group because his "proposal was most responsive to the needs of our Hospital as identified through the request for proposals." Joint App. at A–445. The committee's report details how Dr. King's proposal was most responsive, particularly in the staffing and financing areas. *Id.* Under such circumstances, the contract appears to best meet the needs of the purchaser, the hospital, and by extension its

patients, and therefore it is clearly justified on procompetitiveness grounds.

**14.** The so-called *"per se* violations" of the Sherman Act include that "limited class of cases where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively presumed illegal without further examination.'" *Capital Imaging,* 996 F.2d at 542 (citation omitted) (quoting *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979)).

plaintiff from showing that his injury was caused by the anticompetitive acts."), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). Dr. Balaklaw has demonstrated no such conduct, and *Summit Health* is of little assistance.

It is true that in *Summit Health,* the Supreme Court held that federal jurisdiction did exist over antitrust claims that a hospital had used its peer-review proceedings to effect an illegal group boycott of a physician, but the facts of that case make it inapposite here. The defendant hospital in *Summit Health* used "sham" disciplinary proceedings to terminate the plaintiff ophthalmologist's staff privileges, and it planned to distribute an adverse report about the plaintiff to all the hospitals where he was a member or where he might apply for similar positions. 500 U.S. at ——— ———, 111 S.Ct. at 1845–46. Here, by contrast, Dr. Balaklaw's staff privileges at CMH have not been terminated,[15] he has not been subjected to any disciplinary peer-review proceedings,[16] and there is nothing to suggest that an adverse report is being circulated or that any other "indelible black mark" has been placed on Dr. Balaklaw's record. He claims that being rejected at CMH will stigmatize him in his efforts to obtain new employment. Yet at the hearing

to consider plaintiff's motion for a preliminary injunction, Dr. Balaklaw admitted that when asked on employment applications whether his prior staff privileges had ever been revoked or terminated, he would add an explanation, but always answer "no." Joint App. at A–680. It appears that far from being permanently stigmatized and excluded from his profession, Dr. Balaklaw, like seven of the other eight anesthesiology groups that submitted proposals, simply failed to win the exclusive contract to practice anesthesiology at CMH.[17]

## III. CONCLUSION

"[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Konik v. Champlain Valley Physicians Hosp. Medical Center,* 733 F.2d 1007, 1015 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Here, Dr. Balaklaw entered the competition for an exclusive contract, he interviewed for it, and he lost. He was therefore excluded from further practice at CMH during the term of the contract. Especially in light of the Supreme Court's recognition that a hospital has the "unquestioned right to exercise some control over the identity and

15. We recognize, though, that even though Dr. Balaklaw was reappointed to the Medical Staff in December, 1991, and his membership was subject to renewal in December, 1993, as a result of the contract with the King group, Dr. Balaklaw may not now actually practice at CMH.

16. The peer-review proceedings at issue in *Summit Health* were those contained in the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152 (1988), which limits the term "professional review action" to actions "based on the competence or professional conduct of an individual physician," *id.* § 11151(9). Here, there were no charges against Dr. Balaklaw relating to his professional competence or conduct. The hearing at which Dr. Balaklaw appealed the Board's decision to enter into the contract with Dr. King was authorized by the Hospital's by-laws as an internal grievance procedure for any decision that affected a member of the medical staff's clinical privileges. Such proceedings are not "professional review actions" under the terms of the Health Care Quality Improvement Act.

17. Dr. Balaklaw alleges that, like the plaintiff in *Summit Health,* he was displaced by the Hospital for retaliatory reasons. Even if it is true, as he

alleges, that the Hospital was motivated by an "economic vendetta" against him, absent "proof of harm to the whole market," *Capital Imaging,* 996 F.2d at 543, that is not properly the subject of an antitrust action. "Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability." *Id.* Indeed, were we to characterize the harm to Dr. Balaklaw as an "antitrust injury," conceivably every competitor who ever lost a contract through a competitive bidding process could come to court claiming violations of the Sherman Act. Even if their claims proved meritless, the drawn-out proceedings necessary to evaluate them could chill competitive market forces, a prospect directly at odds with the purposes for which the antitrust laws were enacted. *See id.* at 541 (noting that summary judgment is a vital tool in the antitrust area to prevent wasteful trials that may chill competitive market forces) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986)).

the number of doctors to whom it accords staff privileges," *Jefferson Parish,* 466 U.S. at 30, 104 S.Ct. at 1568, and the frequently expressed judicial approval of exclusive contracts for medical services, *see, e.g., id.* at 43–44, 104 S.Ct. at 1574–75 (O'Connor, J., concurring); *Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1393 (10th Cir.1992); *Beard v. Parkview Hosp.,* 912 F.2d 138, 140 (6th Cir. 1990); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 478–79 (7th Cir.1988); *Coastal Neuro–Psychiatric Assocs. v. Onslow Memorial Hosp.,* 795 F.2d 340, 342 (4th Cir.1986), such exclusion is not enough to constitute an antitrust injury. As we said in *Konik,* "the Hospital is not required to open its operating rooms to any and all anesthesiologists who wish to practice there." 733 F.2d at 1015. By closing it doors to Dr. Balaklaw in favor of one of his competitors, CMH did nothing to inflict an injury of the type the antitrust laws were intended to prevent.

Because Dr. Balaklaw's factual allegations, when considered in a light most favorable to him, establish only that he has been harmed as an individual competitor, we conclude that Dr. Balaklaw has suffered no antitrust injury and therefore lacks standing to prosecute his antitrust claims. Accordingly, the district court's order granting summary judgment to the defendants is affirmed.