**Ifeoma EZEKWO, M.D., Plaintiff,**

v.

**AMERICAN BOARD OF INTERNAL MEDICINE, Montefiore Medical Center, Empire Blue Cross and Blue Shield, and the Bronx Health Plan, Defendants.**

**No. 95 Civ. 10625(RO).**

United States District Court, S.D. New York.

May 12, 1998.

meaning of this provision of ERISA. (Def. Memo. of Law at 3).

Walter Barthold, New York City, for Plaintiff.

Marvin R. Lange, New York City, for Defendant American Board of Internal Medicine.

Garfunkel, Wild & Travis, P.C., Great Neck, NY, Leonard M. Rosenberg, for Defendant Bronx Health Plan.

Weil, Gotshal & Manges LLP, New York City, Debra J. Pearlstein, Jonathan Bloom, for Defendant Empire Blue Cross and Blue Shield.

Epstein Becker & Green, P.C., New York City, William G. Kopit, for Defendant Montefiore Medical Center.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff, Dr. Ifeoma Ezekwo, is a physician licensed in New York State to practice both internal medicine and opthamology. She maintains a practice at 2685 Grand Concourse in Bronx, New York, and had admitting privileges at various hospitals.[1] Regardless of these credentials, however, Dr. Ezekwo did not receive board certification in internal medicine until August 1997, after having failed the certifying exam in 1984,

---

1. Dr. Ezekwo has maintained a practice in internal medicine since 1983. She became licensed in opthamology in 1988. As of April 1993, she represented that she held admitting privileges at Beth Israel Medical Center hospitals, Our Lady of Mercy Medical Center (233rd Street and Pelham Divisions) and Manhattan Eye, Ear and Throat Hospital.

1990, 1992, 1994, and 1995. Despite her practice, but flowing from her repeated exam failures, Dr. Ezekwo now asserts that the American Board of Internal Medicine, the certifying organization, along with various health care providers have conspired to boycott her from the practice of and restrained trade in internal medicine, and that they have monopolized, or attempted to monopolize, the market area being defined as roughly the North Central Bronx. All of these claims are asserted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, with Dr. Ezekwo seeking treble damages and injunctive relief under Sections 4 and 16 of the Clayton Act respectively, 15 U.S.C. §§ 15, 26.[2]

The defendants are the certifying organization, the said American Board, and Montefiore Medical Center, Empire Blue Cross/Blue Shield, and The Bronx Health Plan (BHP), an HMO regulated under New York law. In response to Dr. Ezekwo's claims, each, other than Empire, seeks judgment on the pleadings, Fed.R.Civ.P. 12(c). All seek dismissal of the complaint for failure to state a claim for which relief can be granted on the basis of Fed.R.Civ.P. 12(b)(6). The Board, Montefiore and BHP also move for conversion to summary judgment as allowed under Fed.R.Civ.P. 12(b), 56(c). Finally, Montefiore and BHP also assert immunity under The Health Care Quality Improvement Act, 42 U.S.C. §§ 11101–11152, which grants limited immunity as to money damages for those participating in professional peer review processes. 42 U.S.C. §§ 11101(5), 11111(a).

The Board administers the certifying exam that Dr. Ezekwo repeatedly failed. It is a private, non-membership organization that provides for the voluntary certification of internists, which the public and health care employers may, but are not required to, rely upon in making health care and employment choices. The Board is not a health care provider or employer and creates its certification criteria independent of the market, having no control over how the certification is used or perceived once it is granted.[3]

Over the years, however,[4] the Board's certification has become an important credential for internists, with many (but not all) hospitals, insurance companies and HMOs relying on its certification of a doctor's knowledge and competence in the field of internal medicine. The other defendants, Montefiore, Empire, and BHP, each rely upon the Board's certification—among other things—to some extent in their employment choices. It is this reliance that Dr. Ezekwo equates with conspiracy.

When Dr. Ezekwo first failed the Board's examination in 1992, she requested—under the Board's established review procedures—that her exam be rescored by hand.[5] When the hand-scoring revealed no errors, Dr. Ezekwo suggested that "foul play" had taken place. After asking for and not receiving substantiation for the claim, the Board offered Dr. Ezekwo the opportunity to review her examination along with the answer key, and to meet with the Board, along with her counsel, so the Board could explain its scoring procedure. Dr. Ezekwo did not accept the Board's offer.

In the same year, Dr. Ezekwo applied to Montefiore for admitting privileges in its Departments of Medicine and Opthamology. The record substantiates that these applica-

---

2. One "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may receive treble damages under Section 4 of the Clayton Act. 15 U.S.C. § 15(a). Section 16 provides for injunctive relief. 15 U.S.C. § 26.

   Due to the fact that Dr. Ezekwo passed the certifying examination in August 1997, the injunctive relief sought against the certifying organization is now moot.

3. To receive the Board's certification, a doctor must complete three years of post-graduate training in internal medicine and pass the two-day written exam that the Board administers.

4. The Board has been certifying internists for over 50 years, and is, indeed, the only such certifying body in the field of internal medicine.

5. The Board's examination is machine-scored in the first instance. Under the Board's review procedures, if a candidate for certification believes the exam to be erroneously scored, he or she can request hand scoring. If a candidate fails the exam more than two times, he or she can go over the exam with a Board officer.

tions were processed according to Montefiore's by-laws and established procedures.[6] Of particular note, Montefiore's by-laws set forth the general qualifications required of a doctor seeking admission to its medical staff: (1) the doctor must be licensed to practice in New York State, (2) must be able to document his or her background, experience, training, (3) must demonstrate competence, good reputation, character and ability to work with others, as well as physical and mental capacity to practice, and (4) must provide supporting letters of recommendation. The by-laws also require that the applicant demonstrate an ability and willingness to satisfy the teaching and research needs of the Hospital.[7] Finally, the Department of Medicine requires the Board's certification in internal medicine as part of the documentation supporting an applicant's knowledge and expertise in the field.[8]

Dr. Ezekwo was first interviewed by Montefiore in July 1992, by the Chair and Vice–Chair of the Department of Medicine. She was later interviewed by the Credential Committee in June 1993, which unanimously recommended her application be denied in

July 1993. Shortly thereafter, both the Committee on Promotions & Appointments and the Divisional Credentials Committee recommended the same. Finally, in accordance with the by-laws, Dr. Ezekwo was informed that the Medical Staff Executive Committee (Executive Committee) had prepared an adverse recommendation for the Board of Trustees, on September 24, 1993.[9] The stated rationale for the adverse recommendation was (1) an evident limited fund of medical knowledge based on Dr. Ezekwo's two previous failures on the certification examination, (2) lack of ongoing involvement in house staff teaching programs and an ambivalent attitude regarding participation in the Medical Department's educational programs, and (3) failure to obtain adequate letters of recommendation from Chiefs of Medical Services at other institutions regarding Dr. Ezekwo's current hospital practice. Upon receiving notice of the adverse recommendation, Dr. Ezekwo exercised her right of appeal, requesting a hearing before the Ad Hoc Hearing Committee in October 1993.

Dr. Ezekwo's request for a hearing triggered the extensive appellate procedures es-

6. Montefiore's Medical Staff By–Laws delineate the process for obtaining voluntary attending privileges as well as full-time staff admitting privileges. The hospital is divided into clinical departments that correspond to areas of medical and surgical practice. The by-laws provide that each department is responsible for establishing its own criteria for the grant of clinical privileges. The applications receive a three-tiered evaluation, by (1) the Promotion and Appointment Committee, (2) the relevant Department Chair, and (3) the pertinent divisional Credential Committee of the Medical Staff. The Department of Medicine then reviews each application, the accompanying letters of recommendation, and interviews the applicant. Finally, the Medical Staff Executive Committee makes a recommendation to Montefiore's Board of Trustees as to whether privileges should be extended to the applicant.

7. Montefiore is a voluntary tertiary care teaching hospital, affiliated with the Albert Einstein College of Medicine of Yeshiva University.

8. Exceptions are made for certain doctors with whom the hospital has a prior history or regarding whom the hospital has established knowledge of competence and quality of care; i.e., recent graduates from resident training and nationally renowned researchers, as well as doctors who have been on the medical staff for years.

9. Under Montefiore's Medical Staff By–Laws, an applicant has numerous opportunities for hearing and appeal of adverse recommendations. The by-laws provide that an applicant can appeal the Executive Committee's recommendation prior to that recommendation being relayed to the Board of Trustees. If appeal is taken, the applicant can request a hearing before the Ad Hoc Hearing Committee of the Executive Committee, where the applicant can submit further documentation, examine and cross-examine witnesses, and be represented by counsel. After that hearing, the Ad Hoc Hearing Committee makes a written recommendation to the Executive Committee, which then issues another recommendation for the Board of Trustees. Within fifteen days of that issuance, the applicant may request another appeal if still dissatisfied with the outcome. The second appeal takes place strictly on the record, as reviewed by either the Board of Trustees or a committee thereof, although the applicant does have the right to request oral argument at this stage. If a committee of the Board of Trustees makes the review, it then issues a recommendation to the Board as a whole. The Board as a whole can accept or reverse the prior recommendation, or send it back to the Executive Committee for further consideration or amend the recommendation itself. In any event, the Board's determination is a final one.

tablished under Montefiore's Medical Staff By–Laws.[10] The first hearing was held on November 30, 1993, with six subsequent evidentiary sessions being held, involving over twenty hours of review, ending February 7, 1995. While aware of her right to counsel, Dr. Ezekwo appeared on her own behalf.[11] Dr. Ezekwo presented documentary evidence in large volume and testimony is support of her applications.[12] At the close of the hearings, the Hearing Committee requested a written report marshalling the evidence from both the Executive Committee and Dr. Ezekwo. Dr. Ezekwo refused, however, to provide *her* report.

After two meetings to review the record in February and May of 1994, the Hearing Committee issued a 45–page report and recommendation to the Executive Committee, noting that Dr. Ezekwo had failed the certification examination three times and—while this was not the sole basis for the denial of privileges—it did evince "a lack of fundamental medical knowledge". It also found that Dr. Ezekwo had failed to secure acceptable letters of recommendation; those provided did not address Dr. Ezekwo's teaching ability and working relationships, nor did they include the evaluation of her clinical practice by the Chiefs of Service of those hospitals where Dr. Ezekwo already had privileges. Finally, the Hearing Committee noted that

Dr. Ezekwo had refused to confirm in writing that she would satisfy the Medical Department's teaching requirements despite the fact that such written confirmation was required of all applicants.[13] On these bases, the Hearing Committee recommended denial of Dr. Ezekwo's applications. A copy of the Committee's report was provided to Dr. Ezekwo. The Executive Committee's unanimous confirmation of its original denial of Dr. Ezekwo's applications, based on the Hearing Committee's findings, followed on June 12, 1995.

Again, under Montefiore's Medical Staff By–Laws, Dr. Ezekwo received notice of both the Executive Committee's adverse recommendation and her right to further appellate review. Dr. Ezekwo requested that review, which was provided on August 9, 1995.[14] Dr. Ezekwo was then informed, on August 17, 1995, that the Medical Committee of the Board of Trustees had upheld the denial of privileges. Its recommendation was reported to the full Board of Trustees in October of 1995, and the full Board's final denial was reported to Dr. Ezekwo on October 12, 1995.[15]

Earlier, in April 1993, Dr. Ezekwo first accused defendant The Bronx Health Plan (BHP) and Montefiore of collusion.[16] She first approached BHP for participation in its

---

**10.** *See, id.*

**11.** There were occasions, however, where Montefiore received communications from a Joseph Fleming, Esq., who described himself as Dr. Ezekwo's attorney.

**12.** The hearing's record included over 700 transcript pages and 200 exhibits.

**13.** At the same time, the Hearing Committee addressed Dr. Ezekwo's claims that Montefiore had acted improperly and in bad faith, basing its denial on racial or gender or religious discrimination, and that Dr. Ezekwo's failure at board certification was somehow orchestrated by hospital personnel in fear of competition from her managed care practice. The Hearing Committee found the claims conclusory and without basis.

**14.** Pursuant to the by-laws, this second review was strictly of the record, although Dr. Ezekwo was informed that she could request oral argument and did not do so. *See, supra,* note 10.

**15.** Beyond Montefiore's procedures and review regarding Dr. Ezekwo's admitting privileges, the

matter has received thorough review as well from the Public Health Council of New York State (the Council) as well as the New York State Division of Human Rights (DHR). In September 1993, Dr. Ezekwo filed a complaint against Montefiore with the Council under Public Health Law § 2801–b. That filing was deemed premature given that the Montefiore's appellate procedures were pending. Dr. Ezekwo filed again, subsequent to Montefiori's final determination, on November 11, 1995. As of the time of argument and briefing, the Council had not issued its final determination. As to the DHR investigation, Dr. Ezekwo's complaint against Montefiore was dismissed with a finding of no probable cause to believe the discrimination alleged had occurred.

**16.** Evidently, the BHP offices are in the same building facility as Montefiore Medical Center Clinic. Montefiore was one of the hospitals with which BHP contracted at that time, the others being Bronx–Lebanon Hospital Center and Barnabas Hospital.

network in January 1993, and the exchange of communications that followed quickly led to threats of litigation on Dr. Ezekwo's part.[17] BHP chose not to put Dr. Ezekwo into its application process, stating: (1) it did not need additional opthamologist for efficiency reasons; (2) Dr. Ezekwo was not affiliated with any of the hospitals with which BHP contracted; and (3) of particular relevance to participation as an internist, BHP did not seek solo practitioners for participation in its Plan. As BHP explained, because its network is structured such that its primary care services are presently provided in comprehensive settings such as community health centers, where the entire family can receive a broad array of services under one roof, Dr. Ezekwo could not—as a solo practitioner—"provide the comprehensive services that [BHP's] members demand." Later, in response to Dr. Ezekwo's accusation of collusion, BHP responded as before but further emphasized that (1) even if Dr. Ezekwo were affiliated with one of its contracted hospitals, it had the right to not retain her services, and (2) BHP is an independent HMO, "not

an operational unit" of Montefiore. At no point in its communications with the Dr. Ezekwo did BHP mention board certification, although it is clearly a requirement under its participation criteria.

Finally, at some point during this chronology, Dr. Ezekwo apparently approached defendant Empire for participation within its HMO or PPO structure, but was evidently rejected.[18]

■ In the first instance, I address Montefiore's and BHP's claims to immunity from money damages under Health Care Quality Immunity Act of 1986, 42 U.S.C. §§ 11101–11152 (the Act). The Act provides for such immunity where a peer review process meets certain criteria and is undertaken to achieve certain statutorily permissible ends.[19] The Act establishes a rebuttable presumption of the peer review's propriety that must be overcome by a preponderance of the evidence.[20] As such, although addressed on summary judgement, "[Dr. Ezekwo bore] the burden of proving that the peer review process was not reasonable." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 630 (3rd

17. On January 18, 1993, Dr. Ezekwo wrote to BHP requesting information on BHP's health plan, "so that [she] could start participating immediately." BHP responded on February 1, 1993, that the Plan had no need at that time for additional opthamologists. Dr. Ezekwo replied on February 15, 1993, accusing BHP of discrimination and "anti fair business" and threatening litigation. Separately, on the same date, Dr. Ezekwo requested an investigation by the New York State Insurance Commissioner. After making inquiries on April 4, 1993, the Commissioner's office did not pursue the matter. After a further communication from Dr. Ezekwo's counsel on February 25, 1995, BHP responded that is would not consider Dr. Ezekwo's queries and applications in the area of opthamology or internal medicine, and clarified its position as to why.

18. There are in the record no facts as to what transpired between Dr. Ezekwo and Empire.

19. In pertinent part, Section 11111 provides:
(a) In general
(1) Limitations on damages for professional review actions
If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title ...
(A) the professional review body,
(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or any State (or political subdivision thereof) with respect to the action ....
42 U.S.C. § 11111.

20. Section 11112(a) provides:
(a) In general
For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
(1) in the reasonable belief that the action was in furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action as warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
42 U.S.C. § 11112(a).

Cir.1996). At issue is whether Dr. Ezekwo submitted sufficient evidence to allow a jury-finding that, objectively, a health-care employer had unreasonably believed that it had met the standards set by the Act. *See Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1333 (11th Cir.1994); *Austin v. McNamara,* 979 F.2d 728, 734–35 (9th Cir.1992). There is not enough on the record before me to determine the contours of BHP's peer review procedures, or even if it was applied in this instance. Therefore, even with the statutory presumption of propriety where a peer review process is used, BHP's claim to immunity cannot be upheld. *See, e.g., Mathews,* 87 F.3d at 634 (letter communication between individual doctor and hospital did not equate with a "professional review activity" such that the Act's immunity was triggered). But, Montefiore, on the other hand, has clearly established that a full and fair peer review process was used in this case,[21] and that it should properly receive immunity under the Act as to Dr. Ezekwo's monetary claims. Although the Act does not extend to decisions based solely on "the physician's association, or lack of association, with a professional society or association", it is clear on the record that Montefiore's rejection of Dr. Ezekwo is based on considerations relating to competence, and not just Dr. Ezekwo's non-certification.[22] This leaves, however, her ongoing claims for injunctive relief against Montefiore, the monetary claims against the Board, and both types of claims as pursued against Empire and BHP.

As stated at the outset, all defendants have sought dismissal for failure to state a claim, with the Board, Montefiore and BHP seeking summary judgment. *See* Fed.R.Civ.P. 12(b)(6), 56(c).

■ Empire is the only defendant that moved to dismiss with no motion for summary judgment. Accordingly, I first address Empire's motion to dismiss. At the threshold, I observe that "[e]ven under the liberal Federal Rules of Civil Procedure, there is a limit to how much a court may be called upon to divine in assessing the sufficiency of the complaint before it, particularly when the plaintiff is represented by counsel." *Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972). Conclusory allegations of antitrust violations are simply not enough. *See Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 893 F.Supp. 1207, 1211 (S.D.N.Y.1994), *aff'd* 62 F.3d 69 (2d Cir.1995). Dr. Ezekwo needed to " 'adequately . . . define the relevant product market, . . . allege antitrust injury, [and] . . . allege conduct in violation of antitrust laws.' " *Id.* (citation omitted). Thus, viewing Dr. Ezekwo's pleading as favorably as possible, Empire's motion is granted, as not a single fact is alleged to support the claim that Empire properly operates in Dr. Ezekwo's market, and allegations of conspiracy are limited to the statutory conclusion.[23]

As to the remaining defense motions, I need to and do reach only those for summary judgment, which are granted. The Second Circuit has recognized that, while summary disposition is difficult as to antitrust claims, it is not improper. *Capital Imaging Assocs. v. Mohawk Valley Med. Assoc., Inc.,* 996 F.2d 537, 541 (2d Cir.1993). Although the defendants have the initial burden to show that no genuine issue of material fact exists as to Dr. Ezekwo's claims, once met, Dr. Ezekwo is

---

**21.** A "professional review action", as the Act defines it, is:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity . . . which affects (or may affect adversely) the clinical privileges, or membership in a professional society, of a physician. Such term . . . also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). A "professional review activity" means:

> an activity of a health care entity with respect to an individual physician—

> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
> (B) to determine the scope or conditions of privileges or membership, or
> (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).

**22.** *See* 42 U.S.C. § 11151(9)(A).

**23.** Because Dr. Ezekwo has already amended her complaint, leave to replead will not be granted. *See Berger v. Lowden,* 1997 WL 170823 (S.D.N.Y.) at *4.

required to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(e). As such, she needed to point to "genuine issue[s] of material fact that (1) defendants violated the antitrust laws and (2) the violation caused her actual injury." *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir.1995). More than "a metaphysical doubt" had to be shown, and Dr. Ezekwo needed to "set forth facts [ ] tend[ing] to preclude inference[s] of permissible conduct". *Capital Imaging Assocs.*, 996 F.2d at 542. Summary judgment is granted not only because the defendants meet their initial burden, but because Dr. Ezekwo has utterly failed to counter with any specific facts undercutting the independence and legitimacy of the defendants' actions.[24]

▆▆▆ First, in order to bring a private action under the Sherman Act, an antitrust injury must be proven. The Sherman Act protects competition, not competitors. *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Thus, vital to any antitrust claim is the allegation that the defendants' conspiracy or illegal contract has caused injury to competition. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir.1987). "'Plaintiffs must prove antitrust injury ... [that] reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" *Balaklaw*, 14 F.3d at 797 (quoting *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690). In turn, in order

to find market injury, the impact within Dr. Ezekwo's market must be assessed, requiring some factual submission as to that market's structure and the services offered therein. *Balaklaw*, 14 F.3d at 800. While Dr. Ezekwo has submitted North Central Bronx—however that is defined—as the geographical market, she submits no other evidence regarding its contours. She makes only the bare allegation that her clients have less market choice due to her lack of association with defendants, providing no substantial evidence that shows the number of internists offering services in that area or that the options available to the public have been limited by the defendants' actions. As such, no alleged facts suggest market injury, and accordingly antitrust standing has not been established.

Second, even if Dr. Ezekwo could show antitrust injury, her claim under Section 1 would fail on the merits.[25] She does not allege facts supporting an inference that "(1) a contract, combination or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce" existed between the defendants. *Maric*, 65 F.3d at 313. Indeed, only if the collusion necessary for the first element was evident could I consider whether issues of fact exist as to whether an antitrust violation, per se or otherwise, has been committed.[26]

▆▆▆ Dr. Ezekwo has alleged no factual support for her claim of conspiracy, asserting only a theoretical construct.[27] The inference of "opportunity to conspire" is insufficient; a triable issue must exist as to whether an illegal contract between or "concerted action" by the defendants exists. *See Maric*, 65

---

24. Where "'conduct is as consistent with permissible conduct as with [an] illegal conspiracy'" it "does not, standing alone, support an inference of antitrust conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Evidence must be presented that "'tends to exclude the possibility that [the defendants] were acting independently.'" *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).

25. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1.

26. The fact that Dr. Ezekwo has pleaded a "per se" boycott violation does not change the outcome, because a per se allegation still requires a showing that antitrust injury has occurred, *Balaklaw*, 14 F.3d at 800.

27. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 466–67, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

F.3d at 313 (citing *Capital Imaging Assocs.*, 996 F.2d at 545). *See also Fort Wayne Telsat v. Entertainment and Sports Programming Network*, 753 F.Supp. 109, 115 (S.D.N.Y.1990) (factual basis for allegation of conspiracy under Sherman Act, Section 1, is required). Moreover, Dr. Ezekwo was required to negate any reasonable inference that the defendants acted independently and/or properly by showing they had made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (C.A.3 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)); *Capital Imaging Assocs.*, 996 F.2d at 545. The ordinary prospect of competition from any defendant is not enough on which to base her claim, *Maric*, 65 F.3d at 314, and any consequent commercial injury to her as an individual is irrelevant. *See, e.g., Balaklaw*, 14 F.3d at 797; *Rutman Wine Co.*, 829 F.2d at 735. Thus, the essence of Dr. Ezekwo's complaint is that the Board, alone, developed arbitrary certification criteria that set her up for failure, and the other three defendants then relied thereon to her commercial detriment. There is only the unsubstantiated claim that defendants acted within the market for "internal medicine", and no showing that defendants agreed to or colluded in conduct injurious to that market.[28] Accordingly, the factual allegations not supporting a showing of concerted action, Dr. Ezekwo's Section 1 claim is dismissed on summary judgment as to defendants so moving.

**28.** While Dr. Ezekwo stresses the fact that BHP is located in the same building as a Montefiore clinic, that proximity does not support an inference of conspiracy. Likewise, Dr. Ezekwo asserts the fact that many individuals on Montefiore's reviewing committees are board certified as indicative of conspiracy. But, without a more specific factual basis, the assertion represents only "an opportunity to conspire". *See Maric*, 65 F.3d at 313 (citation omitted). Finally, Dr. Ezekwo argues that further discovery would allow her to substantiate her claims. *See* Fed. R.Civ.P. 56(f). But, in light of the extensive review her case has received on administrative levels, greater discovery would be abusive without a concrete showing of market harm. *See*,

Dr. Ezekwo has also asserted a claim under Sherman Act, Section 2, 15 U.S.C. § 2, alleging that the defendants have monopolized, or attempted to monopolize, the market for internal medicine. Dr. Ezekwo's Section 2 claim falls on said defendants' motions for summary judgment for much the same reasons as do her Section 1 claims.

First, the Act's Section 2 requires injury to the market, as opposed to individual impact, which—again—is not established on this record. *See, e.g., Volmar Distributors, Inc. v. New York Post Co.*, 825 F.Supp. 1153, 1159–60 (S.D.N.Y.1993). Additionally, at trial Dr. Ezekwo would have to prove that the defendants both "possess[ ] monopoly power in the relevant market, and ... [that they have willfully acquired or maintained] that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). *See also, Irvin Indus. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir.1992) (requiring monopoly power in the relevant market, anticompetitive conduct by the defendant, and injury in fact caused by that conduct). There are simply no facts alleged supporting this.[29] Dr. Ezekwo has not even addressed how exactly the Board operates in the market, and has alleged no facts supporting the conclusion that Montefiore and BHP have or are seeking monopoly power, much less that such power has been wrongfully acquired or maintained, or caused subsequent market injury. Dr. Ezekwo's Section 2 claim under the Sherman Act is likewise dismissed on summary judgement.

*e.g., Rutman Wine Co.*, 829 F.2d at 738; *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106–107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

**29.** An "attempted monopolization" claim would require Dr. Ezekwo to prove "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power." *Int'l Audiotext Network, Inc.*, 893 F.Supp. at 1212 (citations omitted). Again, no facts asserted give rise to a reasonable inference that could meet any of these elements.

In sum, all of defendants' motions are granted as specified above, except for BHP's claims for immunity, which however is hereby rendered moot.

Submit orders on notice.