Saeeda A. MAHMUD, M.D., Plaintiff,

v.

Walter KAUFMANN, M.D., Jeff Auerbach, M.D., Jane Brooks, M.D., Gopal Shah, M.D. and David Brody, M.D., Individually, Jointly and Severally, Defendants.

No. 05 Civ. 8090(WCC).

United States District Court, S.D. New York.

March 31, 2009.

542

Law Office Of Carl E. Person, New York, NY, Carl E. Person, Esq., Of Counsel, Adelman, Sheff & Smith, LLC, Annapolis, MD, S. Allan Adelman, Esq., Michael I. Joseph, Esq., of Counsel, for Plaintiff.

Jeffers & Ireland, P.C., Stephen M. Cowherd, Esq., of Counsel, Fairfield, CT, for Defendants.

## OPINION AND ORDER

CONNER, Senior District Judge.

Plaintiff Saeeda A. Mahmud, M.D., brings this action against defendants Walter Kaufmann, M.D. ("Kaufmann"), Jeff Auerbach, M.D. ("Auerbach"), Jane Brooks, M.D. ("Brooks"), Gopal Shah, M.D. ("Shah") and David Brody, M.D. ("Brody" and together with Kaufmann, Auerbach, Brooks and Shah, collectively "defendants") arising out of the denial of her medical staff privileges at Bon Secours Community Hospital (the "Hospital" or "BSCH") and Orange Regional Medical Center ("ORMC"). Plaintiff alleges that defendants failed to renew her contract with the Hospital and thwarted her efforts to contract with ORMC for admitting privileges, both on the basis of her race and in an effort to limit competition in the market for certain specialized medical services in the area of Port Jervis, New York. Plaintiff brings claims pursuant to 42 U.S.C. § 1981, the New York Human Rights Law, New York Executive Law §§ 290, *et seq.* (the "NYSHRL"), the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, and New York General Business Law § 340 (the "NYGBL"), as well as common law claims for interference with prospective economic advantage and *prima facie* tort.

Following a series of opinions and communications with the Court, plaintiff's only remaining causes of action are her fifth and sixth causes of action, for interference with plaintiff's prospective economic advantage and violation of the Sherman Act.[1] Defendants now move for summary judgment on both of these claims. For the reasons stated herein, defendants' motion is granted in its entirety.

## BACKGROUND

Plaintiff, a licensed physician, is board certified in internal medicine and specializes in cardiology. (Mahmud Decl. ¶¶ 3, 6–7.) Defendants are all doctors affiliated with the Hospital. (Id. ¶ 26.) In or about 1996, a representative from Mercy Hospital[2] offered to sell to plaintiff a pulmonary and internal medicine practice, encouraging her to open a cardiology practice because there was only one other cardiologist in the Port Jervis area, Kaufmann. (Id. ¶¶ 10–11.) Before she accepted the offer, plaintiff learned that Kaufmann had an exclusive arrangement for interpreting all

cardiology tests (or "echo tests") administered at the Hospital, but plaintiff was told by representatives of Mercy Hospital that "something will be done about the exclusivity of cardiology tests." (Id. ¶ 13.) These representatives assured plaintiff that, as she expanded her cardiology practice, she would be permitted to interpret her own patients' cardiology tests administered at the Hospital. (Id.) "[A] few weeks later, Kaufmann stated to [plaintiff] that he agreed to this." (Id.) Plaintiff ultimately accepted Mercy Hospital's offer to sell the practice. (Id. ¶ 12.)

However, once plaintiff began working, Kaufmann "rescinded his earlier assurance and made a unilateral decision to read the [cardiology tests] of the ... patients for which [plaintiff] had consulted." (Id. ¶ 15.) According to plaintiff, "[t]his created quality of care issues for [her] patients because of the delay in getting the tests to [her] for her (unpaid) review, and cost [her] about $1,312,500 in lost fees." (Pl. R. 56.1 Stmt. ¶ 22.)[3] Plaintiff sent letters to the Hospital's administration "seeking to rectify this

---

**1.** Defendants moved to dismiss plaintiff's ten-count Complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and in an Opinion and Order dated September 27, 2006, ("*Mahmud I*") the Court dismissed plaintiff's third cause of action under NYSHRL and her eighth and tenth causes of action for *prima facie* tort. *Mahmud v. Kaufmann*, 454 F.Supp.2d 150, 164 (S.D.N.Y. 2006) (Conner, J.). Defendants then moved for reconsideration of the First Opinion, and in an Opinion and Order dated June 27, 2007, ("*Mahmud II*") the Court dismissed plaintiff's first cause of action under 42 U.S.C. § 1981, her fourth cause of action under NYSHRL, and her seventh cause of action under the NYGBL. *Mahmud v. Kaufmann*, 496 F.Supp.2d 266, 278 (S.D.N.Y.2007) (Conner, J.). During a telephone conference before this Court on October 15, 2008, plaintiff withdrew her second cause of action under 42 U.S.C. § 1981 and her ninth cause of action for interference with prospective economic advantage. (Pl. Mem. Opp. Summ. J. at 2.)

Plaintiff's ninth cause of action for interference with prospective economic advantage was based on defendants' alleged intentional disruption of plaintiff's relationships with her patients by making certain comments to those patients. Plaintiff's fifth cause of action, also for interference with prospective economic advantage, *is based on defendants' alleged* "actions ... toward[ ][p]laintiff" in "driving away [her] patients, or forcing patients to consult other doctors with Hospital privileges, through unlawful and/or improper means." (Am.Complt.¶ 51.)

**2.** Mercy Hospital was later renamed Bon Secours Community Hospital. *Mahmud I*, 454 F.Supp.2d at 153 n. 2.

**3.** Local Rule 56.1 provides that upon motions for summary judgment the moving party shall submit "a separate, short and concise statement, *in numbered paragraphs,* of the material facts as to which the moving party contends there is no genuine issue to be tried." (alteration in original). Although it appears

inappropriate poaching of [her] patients' tests ... but this effort failed to bring about any changes." (Mahmud Decl. ¶ 15.) At least one of the defendants "was heading the doctors' committee whose consent would be needed to make the desired change." (*Id.*)

During a period of time spanning from some point in 2000 through June 2001, plaintiff was "often critical of [H]ospital management, and the level and quality of care provided by [the Hospital] and by various doctors on staff at the [H]ospital." [4] (*Id.* ¶ 34.) She often communicated her criticisms orally, "through appropriate channels ... but without result." (*Id.* ¶ 35.) According to plaintiff, despite her complaints, "the quality of care remained the same." (Pl. R. 56.1 Stmt. ¶ 6 (citing Mahmud Decl. ¶ 75).) She then resorted to putting her concerns regarding "inadequate care" in her patients' medical charts, for which she was criticized by the Hospital's administration and her peers. [5] (Mahmud Decl. ¶ 35.) Plaintiff contends that her concerns were "well founded under medical practices." [6] (Pl. R. 56.1 Stmt. ¶ 4.)

---

that defendants' initial Rule 56.1 Statement meets these requirements, defendants' Supplemental Rule 56.1 Statement does not contain any numbered paragraphs. Therefore, the Court's citations to this Statement include only the relevant page number.

Local Rule 56.1 also provides that the papers opposing a motion for summary judgment "shall include *a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing* a separate, short and concise statement of *additional* material facts." (alterations in original). Plaintiff has not provided any statement corresponding to either of defendants' Rule 56.1 Statements. Instead, plaintiff directs the Court to her 84–paragraph declaration, to her own Rule 56.1 Statement, which, according to plaintiff, "is also a brief summary of the material facts," and to two exhibits which, together, contain approximately 185 documents. (Pl. Mem. Opp. Summ. J. at 3.) Plaintiff also includes a seven-page "Partial Statement of Facts" in her Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (*Id.* at 4–12.) Plaintiff's counsel explains: "Instead of attempting to summarize this substantial body of evidence, I have arranged the documents ... so that they tell the story." (*Id.* at 3.) The Court notes that not only is it an attorney's job to *attempt* to summarize the evidence, but it is the attorney's job to actually do so. By barraging the Court with documents in this manner, plaintiff not only fails to comply with Rule 56.1's requirements of "short and concise" statements, but also undermines the purpose of Rule 56.1 "to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Rodriguez v. Morton,* 2009 WL 414033, at *6 (S.D.N.Y. Feb.13, 2009) (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001) (internal quotation marks omitted)).

4. Plaintiff does not specify the nature of her complaints with particularity, although she states that she was concerned about "the level and quality of care provided by the [Hospital]," that "[p]atients' lives were at stake and too many deaths were happening without accountability" and that her complaints concerned "deficiencies [she] saw in BSCH conditions, nursing services and even practices by some doctors." (Mahmud Decl. ¶¶ 34, 35, 75.)

5. Plaintiff avers that she started recording her concerns in the charts because her oral complaints did not result in any remedy of the complained-of deficiencies. (Mahmud Decl. ¶ 75.) By recording the deficiencies in the patients' charts, she would "force [them] to be addressed and corrected" and she also would be protecting herself from blame for "unacceptable quality of care." (*Id.*)

6. The documents plaintiff cites in support of this proposition concern plaintiff's qualifications, conduct and medical care; they do not corroborate or address the validity of plaintiff's complaints about hospital conditions. (*See* Mahmud Decl. ¶¶ 84A–84N; Person Decl., Ex. P at 11, 76.)

In the Spring of 2001, the Hospital was evaluated by the Joint Accreditation Hospital Commission ("JAHCO") for purposes of its re-accreditation. (Mahmud Decl. ¶ 37.) Plaintiff made an appointment to meet with the JAHCO to report her concerns about "the level and quality of care provided by the [H]ospital." (*Id.* ¶ 37.) She cancelled the appointment after certain employees [7] of the Hospital told her to not express her criticisms about the Hospital to JAHCO and threatened her. (*Id.* ¶ 38.)

In July 2001, Thomas Brunelle ("Brunelle"), Executive Vice President/Administrator of the Hospital, notified plaintiff that, at the request of the Hospital's Physician Quality Assurance Committee, he would arrange for an independent medical review of her charts to investigate her concerns about the level of care that was being rendered to her patients. (Defs. Supp. R. 56.1 Stmt. at 1.)

Dr. Ronald Tatelbaum ("Tatelbaum") conducted the review of plaintiff's charts (the "charts") and by letter, dated October 15, 2001, (the "Tatelbaum Report") reported that there were " 'serious medical issues and understandings of the basic physiology and pathology which . . . need to be addressed' " regarding plaintiff's *own* patient care. (*Id.*) Tatelbaum also noted his impression, based on the charts, that " '[plaintiff] has little respect for [H]ospital rules and regulations and little understanding of the value of a [H]ospital chart and documentation therein' " and he suggested that plaintiff be referred to the Committee for Physicians Health ("CPH").[8] (*Id.* at 1–2.)

Brunelle sent the Tatelbaum Report to the Hospital's Medical Executive Committee ("MEC") and requested that " 'corrective action' " be taken with regard to plaintiff, in accordance with Article VIII of the Medical Staff Bylaws (the "Bylaws"). (Defs. Suppl. R. 56.1 Stmt. at 2.) Pursuant to Section 8.1.2 of the Bylaws, the MEC referred the matter to Brooks, the Chief of the Department of Medicine, for further investigation. (*Id.*) Brooks, pursuant to the Bylaws, appointed an ad hoc committee (the "Ad Hoc Committee") to investigate the matter. (*Id.*) By letter, dated November 6, 2001, Brooks informed plaintiff that the Ad Hoc Committee had been appointed and that plaintiff could submit written materials to and had a right to an interview with this committee "to discuss, explain or refute the charges which have been made." (*Id.*; Lasch Decl., Ex. A at 162.) Brooks also sent plaintiff a copy of the Tatelbaum Report. (Defs. Suppl. R. 56.1 Stmt. at 2.)

On November 27, 2001, the Ad Hoc Committee informed Brooks that it had reviewed plaintiff's charts and "agree[d] 'in general with the majority of the issues raised by . . . Tatelbaum.' " (*Id.*) Brooks notified the MEC of the Ad Hoc Committee's findings and that she had been in touch with the CPH, which had recommended that plaintiff undergo a complete physical and psychiatric evaluation at Massachusetts General Hospital. (*Id.*) Brooks

---

7. None of these employees are named defendants in the instant litigation.

8. The CPH, a division of the Medical Society of the State of New York, provides "nondisciplinary, confidential assistance to physicians . . . experiencing problems from stress and difficult adjustment, emotional, substance abuse and other psychiatric disorders." (Defs. Suppl. R. 56.1 Stmt. at 2 n.2.)

Plaintiff contends that defendants "communicated with the Physicians Health Committee and induced them to request that [plaintiff] undergo psychiatric evaluation, when in fact she was functioning properly and in no need of treatment, evaluation or diagnosis." (Pl. R. 56.1 Stmt. ¶ 9.) It appears plaintiff relies on her own sworn statements to support the proposition that defendants "induced" the CPH to request her evaluation.

also recommended that plaintiff undergo the evaluation before the Ad Hoc Committee made its final recommendations to the MEC. (*Id.*) Brooks then sent a letter to plaintiff, wherein she urged plaintiff to take advantage of the opportunity to meet with the Ad Hoc Committee. (*Id.* at 3.)

According to plaintiff, the Ad Hoc Committee was comprised of the defendants and "several other doctors under their control." (Mahmud Decl. ¶ 40.) Plaintiff also contends that Tatelbaum, a cardiologist, "had a relationship with" Bon Secours Charity Health System [9] "through his referral[s] of patients from his office," and that his recommendation "went beyond [the] scope of cardiology to suggest that [she] be sent for psychiatric evaluation." (*Id.* ¶ 42.) Plaintiff had the charts reviewed by another physician, Dr. Janet Strain ("Strain"), "an interventional cardiologist," who concluded that plaintiff's care, as reflected in the charts, "has been without reproach" and was "appropriate and expeditious." (*Id.* ¶ 43; Person Decl., Ex. P at 11.) Plaintiff sent a copy of Strain's report to Brooks and Auerbach.[10] (Defs. Suppl. R. 56.1 Stmt. at 3.)

On December 11, 2001, Brooks notified the MEC that the Ad Hoc Committee had met with plaintiff and still believed that plaintiff had " 'an apparent lack of knowledge of current practice standards' " and that she had made " 'inappropriate and incriminating statements in medical charts against colleagues and [the Hospital].' " (*Id.*) Brooks recommended that the MEC consider suspending plaintiff until she completed the physical and psychiatric evaluation recommended by the CPH. (*Id.*; Lasch Decl., Ex. A at 174.) Brooks also

sent a letter to plaintiff, urging her to contact Massachusetts General Hospital to schedule the evaluation. She told plaintiff:

> "This evaluation and our contact with the [CPH] was done for your protection. I sincerely hope that you will avail yourself of this opportunity. I have been informed ... by the [CPH], that if you have not scheduled this appointment on or before December 14, 2001, your case will be dropped by the [CPH]."

(Defs. Suppl. R. 56.1 Stmt. at 3.) On December 12, 2001, plaintiff informed Brooks that she had contacted the hospital administration to inquire about monetary reimbursement pertaining to her evaluation at Massachusetts General Hospital. (*Id.*) Brooks then reported to the MEC that plaintiff had been in touch with the CPH and that plaintiff would be undergoing an evaluation by Dr. Julia Reade ("Reade"). (*Id.*) Brooks also forwarded to the MEC summaries of chart reviews made by the Ad Hoc Committee. (*Id.*)

The MEC reviewed Tatelbaum's findings, the Ad Hoc Committee's reports, Brooks's recommendation and charts prepared by plaintiff and concluded that plaintiff's " 'patient care and charting have been inappropriate in a number of instances.' " (*Id.* at 4.) The MEC notified plaintiff of its findings and informed her that it would defer any further action until after she had been evaluated by Reade. (*Id.*) The MEC also recommended to plaintiff that she take a leave of absence until the evaluation was complete and a determination was made regarding whether it was appropriate for her to resume her practice. (*Id.*; Lasch Decl., Ex. A at 190.) By letter dated December 21, 2001, plaintiff's attor-

---

9. Plaintiff does not identify what relationship, if any, exists between Bon Secours Charity Health System and BSCH. (*See, e.g.,* Mahmud Decl. ¶ 9.)

10. At some point, Dr. Smits Kittur ("Kittur"), a neurologist, performed a neurological examination of plaintiff. (Mahmud Decl. ¶ 43; Lasch Decl., Ex. A at 256.) Kittur also reviewed the charts and concurred in Strain's conclusion. (Mahmud Decl. ¶ 43.)

ney notified the MEC that plaintiff was making arrangements for the evaluation by Reade but would not take a leave of absence. (Defs. Suppl. R. 56.1 Stmt. at 4.) Plaintiff was subsequently evaluated by Dr. Jhaveri of Middletown, New York. (*Id.*)

On February 14, 2002, the Ad Hoc Committee issued a report to Brooks stating that, after reviewing the charts that plaintiff prepared, it concluded that "there were multiple instances where [plaintiff's] care was inappropriate, unnecessary, and did not meet the standards of care of current medical practice." (*Id.* at 4; Lasch Decl., Ex. A at 202.) By letter dated February 21, 2002, Kaufmann, Chief of Staff of the Hospital, informed plaintiff that the MEC held a special meeting about her on February 19, 2002 because of her failure to be examined by Reade and her " 'ongoing patient care issues.' " (Defs. Suppl. R. 56.1 Stmt. at 4.) Kaufmann also told plaintiff that the MEC, after considering her " 'refusal to be evaluated as [she] had initially agreed, as well as all of the information which has been presented about [her] clinical activities and charting,' " had decided to recommend to the Board of Directors that her medical staff membership and clinical privileges be terminated, but that before making such a recommendation, the MEC would provide plaintiff with a final opportunity " 'to obtain an appropriate evaluation, and, if indicated, obtain counseling or therapy.' " (*Id.* at 4–5.) Kaufmann also informed plaintiff that the MEC would consider the matter again at its next meeting, on March 11, 2002, at which meeting she would have the opportunity to appear. (*Id.* at 5.)

Plaintiff appeared at the meeting on March 11, 2002, "and that portion of the meeting [for which she was present] was recorded and transcribed." (*Id.*) The MEC voted that plaintiff must be evaluated at Massachusetts General Hospital at the Medical Staff's expense. (*Id.*) On March 12, 2002, Kaufmann reported to the Hospital Board of Directors the history and present status of the review concerning plaintiff and, on March 13, 2002, he notified plaintiff of the MEC's recommendation that she undergo an evaluation. (*Id.*)

On March 28, 2002, plaintiff was evaluated by Reade. (*Id.*) In a report to the CPH, dated April 12, 2002, Reade stated, *inter alia,* that plaintiff " 'suffers from a severe personality disorder, and functions in the narcissistic realm' "; that she " 'becomes enraged and attacking when criticized or frustrated' "; and that she " 'attributes her difficulties to the envy and malign actions of others and takes no responsibility for her own bad behavior.' " (*Id.* at 5–6.) Reade concluded:

> "Given [plaintiff's] erratic behavior, the incidents of her reportedly inadequate patient care, her possible seizure history and her poor performance on various psychological tests . . ., we have serious concerns about [plaintiff]'s current fitness to practice medicine. Until her neuropsychological status has been fully evaluated, her clinical patient care should be closely supervised."

(*Id.* at 6.)

In mid-April, 2002, the CPH forwarded Reade's report to Auerbach, the Medical Director of the Hospital, with a recommendation that plaintiff undergo further evaluation by a behavioral neurologist and a neuropsychologist and that the hospital " 'continue to provide oversight' " of her care. (*Id.*) In a letter to plaintiff dated April 22, 2002, Auerbach expressed concern that plaintiff had not agreed to participate in the CPH's evaluation of her. (*Id.*) He noted that her medical staff membership and clinical privileges had been extended to April 12, 2002 and again to May 12, 2002 " 'based on the expectation that

[she] would be actively participating in the evaluation of the [CPH].'" (*Id.* at 6–7.) Auerbach informed plaintiff that if the Hospital did not receive written confirmation by April 26, 2002 that she had agreed to cooperate with the CPH, the MEC would recommend that the Board of Directors allow plaintiff's medical staff membership and clinical privileges to expire. (*Id.* at 7.)

In a letter to the Hospital's counsel, dated April 24, 2002, the CPH reported that plaintiff was "eligible under law to join this [c]ommittee" but that her compliance would be "crucial to her success," noting Reade's assessment of plaintiff's "lack of motivation to change, absence of insight and specific hostility to psychological inquiry." (Lasch Decl., Ex. A at 247.) In that letter, the CPH informed that it was "'possible that [plaintiff] would respond to firm, clear, external limits,'" which the CPH would be "'prepared to set up and assist her with.'" (Defs. Suppl. R. 56.1 Stmt. at 7.)

On May 6, 2002, the MEC met and considered the CPH's recommendation that, for plaintiff to continue practicing medicine at the Hospital, direct, concurrent monitoring and supervision of her care would be required. (*Id.*) By letter dated May 7, 2002, the CPH informed plaintiff that, as plaintiff did not reach a monitoring agreement with the Hospital, effective May 5, 2002, at 5:00 p.m., plaintiff must "'cease the practice of medicine'" at the Hospital. (*Id.*) According to the letter, this meant that plaintiff could not "'perform any duties that require a medical license at the [H]ospital or in [her] office until [she has] been cleared for duty by an approved behavioral neurologist and [the CPH].'" (*Id.*)

By letter dated May 9, 2002, Brunelle notified plaintiff that it was the unanimous consensus of the MEC that the Hospital did not have the resources to provide the level of review and supervision recommended by the CPH for plaintiff to continue practicing there. (*Id.*) Brunelle informed plaintiff that the Board of Directors would meet on May 14, 2002 to consider the recommendations of the MEC and the CPH and that plaintiff could submit written information for the Board of Directors to consider at that meeting. (*Id.* at 7–8.)

On or about May 14, 2002, plaintiff requested a leave of absence, citing health reasons. (*Id.* at 8.) Plaintiff states that she requested the leave because she was "[a]fraid of [defendants'] apparent power and influence with the medical establishment." (Mahmud Decl. ¶ 46.) Brunelle notified her that her request was granted and that further action on her application for reappointment to the Medical Staff was deferred indefinitely. (Defs. Suppl. R. 56.1 Stmt. at 8.)

By letter dated August 1, 2002, the CPH informed plaintiff that, although Kittur and Dr. Charles Bradshaw had concluded that it did not appear that she had any neurological organic disease and that her psychological testing results "did not contraindicate [her] return to work," neither evaluator had formulated a diagnosis on her behalf and because she had "not been given a diagnosis by the most recent evaluators, [she was] not eligible to join [the CPH] at [that] time." (*Id.* at 8.; Lasch Decl., Ex. A at 256.)

By letter dated November 25, 2002, Brunelle asked plaintiff whether she wanted to pursue her application for reappointment at the Hospital, which application, according to the letter, was pending at the time plaintiff took a medical leave of absence. (Defs. Suppl. R. 56.1 Stmt. at 8; Lasch. Decl., Ex. A at 30.) Plaintiff responded by letter dated December 3, 2002, wherein she informed Brunelle that she would not reapply for privileges because she had been "so traumatized by [Brunelle's] be-

havior and that of the seven doctors on the [MEC] that it appears impossible for [her] to reapply." (Defs. Suppl. R. 56.1 Stmt. at 8; Lasch Decl., Ex. A at 260.) Brunelle then advised plaintiff that her pending application, which had been on hold, was deemed to have been withdrawn. (Defs. Suppl. R. 56.1 Stmt. at 8.)

In a letter dated December 16, 2002 to the Office of Professional Medical Conduct ("OPMC"), Brunelle, without referring to plaintiff by name, described the circumstances of plaintiff's withdrawal of her application and inquired whether it was necessary to report her withdrawal pursuant to the New York Public Health Law. (*Id.*; Lasch Decl., Ex. A at 313–15.) He enclosed with the letter redacted copies of the reports made by Tatelbaum and Strain. (Defs. Suppl. R. 56.1 Stmt. at 8.) The OPMC informed Brunelle that his letter had been forwarded to Brian M. Murphy ("Murphy"), the OPMC's Chief Counsel. (*Id.*) In March 2003, Murphy informed Brunelle that the withdrawal of an application for privileges under the circumstances described in Brunelle's letter required reporting under state law. (*Id.*) Brunelle then informed the OPMC that the physician at issue was plaintiff. (*Id.*)

In May 2003, plaintiff "applied for affiliation" with ORMC. (Mahmud Decl. ¶ 52.) In June 2003, Auerbach provided information to ORMC in response to its request for information about plaintiff pursuant to state law. (Defs. Suppl. R. 56.1 Stmt. at 9.) In a letter to Auerbach dated August 14, 2003, plaintiff requested that he forward to Dr. Mark Tuckfelt ("Tuckfelt") at ORMC " 'all documentation associated with the review process related to my performance at [BSCH], including [Auerbach's] letter to ... [the OPMC].' " (*Id.*) Auerbach responded that he would comply with her request and sent to the OPMC any and all documents associated with plaintiff's review process not already pro-

vided. (*Id.*; Lasch Decl., Ex. A at 283.) In a letter to Brunelle dated March 22, 2004, plaintiff requested that certain additional documents be sent to Tuckfelt at ORMC. (Defs. Suppl. R. 56.1 Stmt. at 9.) By letter dated April 20, 2004, Brunelle sent Tuckfelt the documents requested by plaintiff, to the extent that those documents existed. (*Id.*)

In December 2002, Tuckfelt notified plaintiff that, for her application to ORMC to proceed, ORMC needed explanations from both plaintiff and BSCH of the circumstances leading to her leave of absence from BSCH. (Person Decl., Ex. P at 41.) According to Tuckfelt, staff members at BSCH were reluctant to discuss these circumstances and he asked plaintiff to provide BSCH with a release of the information to ORMC. (*Id.*)

In a letter to plaintiff dated October 28, 2003, Tuckfelt informed her that after reviewing the reports and correspondence relating to plaintiff's work experience at BSCH, and in light of ORMC's Medical Staff Bylaws, which require that physicians adhere to the ethics of their profession and be capable of working with others and delivering patient care, there was "sufficient evidence to question whether [she] qualified under [the terms of the Bylaws] especially character and ability to work with others." (*Id.* at 70.) Tuckfelt suggested that she consider withdrawing her application to ORMC. (*Id.*) Plaintiff "persisted in [her] application for privileges at ORMC." (Mahmud Decl. ¶ 55.)

Tuckfelt then contacted the OPMC, stating that, although it appeared that BSCH had reported plaintiff to the OPMC, she claimed that she never received any correspondence from the OPMC, thereby "essentially denying any knowledge of having been reported to [the] OPMC." (Person Decl., Ex. P at 72.) Tuckfelt stated that it seems "unlikely" that plaintiff would have been unaware that BSCH reported her to

the OPMC and, therefore, he requested assistance in evaluating plaintiff's character. (*Id.*) In a letter dated December 23, 2003, the OPMC informed Tuckfelt that, after interviewing him and plaintiff, the OPMC had concluded its investigation of plaintiff and determined that there was no evidence to support a charge of misconduct under state law. (*Id.* at 76.)

From October 2003 to April 2004, the OPMC investigated plaintiff's conduct at BSCH. (Mahmud Decl. ¶ 49.) The case was then closed. (*Id.*) In a letter dated July 26, 2004, the New York Department of Health informed plaintiff that, after considering her complaint against BSCH for improper failure to renew her privileges, and after reviewing and considering information relevant to the matter, it found that the Hospital's reasons for suspending her privileges were consistent with the New York Public Health Law. (Lasch Decl., Ex. C.)

On June 28, 2004, the Medical Executive Committee at ORMC "acted to deny privileges to [plaintiff]." (Mahmud Decl. ¶ 57.) Plaintiff contends that ORMC "relied upon the documents created by [defendants] to deny [her] admitting privileges at ORMC

..., which result was predictable as well as desired by [defendants]." [11] (Pl. R. 56.1 Stmt. ¶ 17.) She admits that there is no evidence that any of the defendants spoke to anyone at ORMC about her or her application. (Mahmud Decl. ¶ 69.)

Plaintiff contends that defendants and other doctors at the BSCH "directed their attention to sham, ill-founded activities intended to create an injurious written record ..., force [her] to withdraw from BSCH under threat of making unfounded charges of unprofessional conduct against [her] ..., and to prevent her from obtaining admitting privileges at other hospitals." [12] (Pl. R. 56.1 Stmt. ¶ 8 (internal citations omitted).) She asserts that they "deviated from their custom and practice of dealing with physician issues in executive session without any writings to record the events ... so that there would be documents making [plaintiff] look bad,[13] which documents were required to be sent to the NYS regulatory agencies upon request or to any hospital at which [she] may seek admitting privileges." (*Id.* ¶ 11.) [14] Plaintiff asserts that the Tatelbaum Report "was specifically requested by [defendants] to be adverse" [15] so that defendants

11. To support the proposition that defendants desired that ORMC rely on the documents "created" by them to deny admitting privileges to plaintiff, plaintiff relies only upon her own declaration. (*See* Pl. R. 56.1 Stmt. ¶ 17 (citing Mahmud Decl. ¶¶ 50, 53).)

12. To support this proposition, plaintiff cites her own declaration and directs the Court to over 100 "ORMC documents," without providing any citations to page numbers. She also provides the citation "Ex. R, PX B–E in depositions of Defendants" however it is unclear to which parts of defendants' deposition testimony she intends to refer. (Pl. R. 56.1 Stmt. ¶ 8.)

13. Although plaintiff cites Auerbach's deposition testimony, nothing in that testimony indicates any intent on the part of defendants to cast plaintiff in a bad light.

14. However, the record reflects that, while the MEC typically kept written minutes of regular meetings, it did not keep such minutes at executive sessions in the interest of maintaining the confidentiality of those meetings, "[s]o that things that are being discussed [are] not [] used to harm any individual or part of the hospital as it's being processed." (Person Decl., Ex. H (Kaufmann Dep. at 16:6–17:17).)

15. In support of this proposition, plaintiff explains that defendants requested that the report be adverse "through failure to confront [Tatelbaum] with Strain letter ... or the report of nuerologist Dr. Kitur [sic] who concurred with [] Strain." (Pl. R. 56.1 Stmt. ¶ 19.) Her citations to the record do not indicate whether defendants shared the reports prepared by Strain and Kittur with Tatelbaum.

could use it "as part of their activities directed against [p]laintiff and her career as a doctor and cardiologist." (Pl. R. 56.1 Stmt. ¶ 19 (citing Mahmud Decl. ¶¶ 45, 53, 67–68).)

Plaintiff currently practices medicine and has admitting privileges at St. Anthony Community Hospital, a sister hospital to BSCH, and "work[s] closely with" Good Samaritan Hospital, also a sister hospital to BSCH, where she has been encouraged to apply for admitting and consulting privileges. (Mahmud Decl. ¶ 17.) She was appointed Director of Cardiology at Ellenville Regional Hospital in November 2007, and has had admitting and consulting privileges at Catskill Regional Hospital, in Sullivan County, since 2006. (*Id.*) In June 2008, Tatelbaum offered to plaintiff a position as a physician in his medical group and, at least as of October 2008, the offer remains open. (*Id.* ¶ 42A.)

BSCH is located 17 miles away from ORMC, which is located in Middletown, New York and is the hospital in closest proximity to BSCH. (*Id.* ¶ 27.) The Horton Medical Center, one of two ORMC facilities in Middletown, is the hospital in closest proximity to BSCH that provides cardiac care. (*Id.*) According to plaintiff, the "main hospitals for cardiac care" are: Vassar Hospital in Poughkeepsie, New York (about 45 minutes from BSCH); Good Samaritan Hospital in Suffern, New York (about 45 minutes from BSCH); a hospital that is not specified by name in plaintiff's declaration, but which is located in Kingston, New York; and Newton Hospital in New Jersey. (*Id.*) Plaintiff's cardiac patients live in Port Jervis "and a 5–mile surrounding area." (*Id.* ¶ 28.) According to plaintiff, "BSCH is the nearest hospital for all of these patients." (*Id.*)

Plaintiff now maintains a professional practice in Port Jervis and her office is equipped with "modem cardiac-care equipment," however, her practice "is not an adequate substitute for a fully-staffed hospital, especially one with a coronary care unit and an intensive care unit." (*Id.* ¶ 30.) For plaintiff to treat patients in a hospital setting, they must be transported or transport themselves to one of the hospitals at which she has admitting privileges,[16] involving "about 30 to 45 minutes of … travel time [beyond that which would be required to the Hospital]," and such a length of travel time can be "dangerous for certain cardiac patients." (*Id.*) Many of plaintiff's patients are "very sick, elderly and poor," and "[d]ue to their medical condition as well as financial situation … are unable to travel [away] from the immediate area." (*Id.* ¶ 31.) When they are admitted to BSCH, plaintiff has no input in their treatment and is "never called to … give their recent test results or medication." (*Id.* ¶ 32.)

Plaintiff avers that, as a result of "losing" admitting privileges at BSCH and failing to obtain such privileges at ORMC, she has incurred attorneys' fees, loss of revenues, excessive travel charges and loss of "time spent in the office because of the need to travel to distant hospitals." (*Id.* ¶ 18.) Her work schedule, which involves significant travel and long hours, has caused her personal life to suffer and has prevented her from performing "income producing speaking engagements." (*Id.*) She also "lost many cardiac patients." (*Id.* ¶ 58.)

Plaintiff contends that "[t]he activities of [defendants] put patients at risk because they had to choose between the cardiologist they wanted as their doctor ([plain-

---

16. As noted above, plaintiff has admitting privileges at Ellenville Regional Hospital, Catskill Regional Medical Center and St. Anthony Community Hospital. (Mahmud Decl. ¶ 30.)

tiff] ) and the nearest hospital for cardiac care in the event of a cardiac emergency." (Pl. R. 56.1 Stmt. ¶ 16 (citing Mahmud Decl. ¶¶ 28, 32).) When plaintiff no longer had admitting privileges at BSCH, some of her patients sought and received cardiac treatment from Kaufman, a physician named Dr. Singh and "other cardiologists with admitting privileges at BSCH." (Mahmud Decl. ¶ 50.) Plaintiff also contends that patients specifically in "the geographic market of Port Jervis and surrounding area (8–10 mile radius)" have been damaged, citing the declarations of 35 former and current patients of plaintiff, each of whom states that the patient would like plaintiff to be able to treat him or her at BSCH and some of whom also provide anecdotes about positive experiences while being treated by plaintiff. (Pl. R. 56.1 Stmt. ¶ 20; Person Decl., Ex. O.)

Plaintiff states that "[d]efendants have *de facto* control of who is permitted to admit patients at BSCH through their mutually consensual rotation of positions of influence, such as Chief of Staff, Medical Director and Chief of Medicine in addition to chairing the Credentials, Medical Examinations and Quality Assurance Committees." (Mahmud Decl. ¶ 33.) Plaintiff states further that "[t]hrough their ability to influence and/or control the allocation of admitting privileges ... [and] consulting privileges at the Hospital and through the use of referrals, they control or at least have undue and disproportionate influence over a majority of the other physicians who can vote on such matters at BSCH." (*Id.*)

According to Kaufman, since 1982, no cardiologist who has applied for privileges to BSCH has been denied; there were six cardiologists on staff on September 30, 2008, the date of his deposition; and since 2002, four new cardiologists have joined the staff. (Person Decl., Ex. H (Kaufman Dep. at 37:4–17).)

## DISCUSSION

### I. *Legal Standard*

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof.... The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial.... A metaphysi-

cal or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial.... The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. DiFasi*, 1997 WL 436750, at *2 (W.D.N.Y. July 30, 1997) (internal quotation marks and citations omitted).

■ Furthermore, "as the Supreme Court observed ... summary judgment remains a vital procedure tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Bogan v. Nw. Mut. Life Ins. Co.*, 953 F.Supp. 532, 537–38 (S.D.N.Y.1997) (Conner, J.), *aff'd*, 166 F.3d 509 (2d Cir. 1999). "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec.*, 475 U.S. at 588, 106 S.Ct. 1348. Specifically, "conduct as consistent with permissible conduct as with an illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

## II. *Antitrust Claim*

■ Plaintiff contends that defendants violated the Sherman Act by conspiring to create a monopoly over specialized medical services in the Port Jervis area.[17] (Am.Complt.¶¶ 56–57.) Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Only unreasonable restraints are actionable under the antitrust laws. *See New York ex rel. Spritzer v. Saint Francis Hosp.*, 94 F.Supp.2d 399, 411 (S.D.N.Y.2000) (Conner, J.) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985)). Section 2 imposes liability on any person "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of ... trade or commerce." 15 U.S.C. § 2.[18]

■ To prevail on a Sherman Act claim, under either section, the plaintiff must prove an antitrust injury. *Ezekwo v. Am. Bd. of Internal Med.*, 18 F.Supp.2d 271, 278–79 (S.D.N.Y.1998), *aff'd*, 173 F.3d 844 (2d Cir.1999). To prove an antitrust injury, the plaintiff must show that the defendants' actions caused an injury to competition; demonstrating injury only to individual competitors is insufficient. *Ezekwo*, 18 F.Supp.2d at 278. "Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors." *Capital Imaging*

17. As noted in *Mahmud I*, "[a]lthough plaintiff does not specifically allege a claim under the Clayton Act, sections 4 and 16 of that Act, 15 U.S.C. §§ 15, 26, permit a private party to recover damages and seek injunctive relief for any violation of the Sherman Act.... As plaintiff is seeking damages and injunctive relief, we therefore treat plaintiff's suit as seeking recovery under the Sherman Act through the private right of action provided for in the Clayton Act." 454 F.Supp.2d at 159 n. 13 (internal citations omitted).

18. It is not clear from the Amended Complaint whether plaintiff intends to assert her antitrust claim under section 1, section 2 or both sections of the Sherman Act. She states that defendants' conduct was "contrary to 15 USC 1 et seq." (Am.Complt.¶ 57.) Her opposition papers cite both section 1 and section 2. (*See, e.g.*, Pl. Mem. Opp. Summ. J. at 13, 17.) However, it is not necessary to determine this issue for the discussion below as the analyses is applicable to both sections.

*Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir.1993).

■ To that end, the Court must assess the impact of the defendants' actions upon the plaintiff's market, which requires "some factual submission as to that market's structure and the services offered therein." *Ezekwo*, 18 F.Supp.2d at 278. The plaintiff bears the burden of establishing and proving the relevant market. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 724, 726 (3d Cir.1991). "The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir.2004) (internal quotation marks and citation omitted). It is "the geographic and product/service area that is affected by the questioned activity or operation," *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F.Supp. 998, 1011 (S.D.Tex. 1997) (internal quotation marks and citation omitted), and it "provides the context against which to measure the competitive effects" of the defendants' alleged anticompetitive conduct. *Geneva Pharms. Tech.*, 386 F.3d at 496.

Plaintiff alleges in her Amended Complaint that the relevant services market is the "market for certain specialized medical services, such as cardiology, oncology and gastroenterology" and that the relevant geographic area is "the tri[-]state area, centered in Port Jervis, New York and extending north to Monticello, New York[,] west to Milford, Pennsylvania[,][s]outh to Newton, New Jersey and east to Middletown and Warwick, New York." (Am. Complt.¶¶ 55–56.) In her opposition papers to the instant motion, plaintiff attempts to present a new, smaller geographic market, consisting of "Port Jervis, New York, and stretching outward to a distance halfway between the nearest hospital in any direction," which consists of an 8–10 mile radius around Port Jervis. (Pl.

Mem. Opp. Summ. J. at 15–16.) Plaintiff's new description of the relevant geographic market contradicts the allegations in the Amended Complaint. At least three of the bordering locations in the Amended Complaint are greater than 10 miles away from Port Jervis. Plaintiff also argues in her opposition papers that the relevant service market is "cardiac medical services coupled with hospital admitting privileges." (Pl. Mem. Opp. Summ. J. at 16.) This description also contradicts the allegations in the Amended Complaint, which defines the relevant market as simply the "market for specialized medical services" without any mention of "admitting privileges." (Am.Complt.¶ 56.)

■ Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment. *Alali v. DeBara*, 2008 WL 4700431, *3 n. 6 (S.D.N.Y. Oct.24, 2008). *See also Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, at *6 (S.D.N.Y. Dec.15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.") Therefore, the allegations in the Amended Complaint govern the description of the relevant market for purposes of this motion. Plaintiff has not submitted any evidence to support the relevancy of the geographic market that she alleges in her Amended Complaint—*i.e.*, that those boundaries border an area in which specialized medical services are "reasonably interchangeable"—and, therefore, she fails to carry her burden to establish that this is the relevant market. *Geneva Pharms. Tech.*, 386 F.3d at 496.

However, even if we did accept, as the relevant market, the market that plaintiff espouses in her opposition papers, plain-

tiff's antitrust claims would still fail because she has not established any antitrust injury within this market. In the context of this case, an antitrust injury in this market would be an injury to individuals seeking emergency cardiac services[19] for whom BSCH is the nearest hospital. *See Ginzburg,* 993 F.Supp. at 1015 ("[B]ecause the purpose of antitrust law is the promotion of consumer welfare, the court must analyze the antitrust injury from the perspective of the consumer") (internal quotation marks and citation omitted). Plaintiff has not directed the Court to any competent evidence indicating that patients at BSCH received inferior emergency cardiac care because of defendants' actions. Nor has she demonstrated that, due to defendants' actions, the price of emergency cardiac care services has increased or that, other than patients' inability to select plaintiff at BSCH, the choice of physicians in the market has changed. *See Korshin v. Benedictine Hosp.,* 34 F.Supp.2d 133, 138 (N.D.N.Y.1999) (That court, finding that plaintiff-anesthesiologist failed to allege antitrust injury, noted that plaintiff did not allege "any change in the price of anesthesiology services, a decrease in the quality or efficiency of care, or that consumers of anesthesiology services ... have less of a market choice, other than

their [in] ability to select [plaintiff], as a result of defendants' actions"); *Ginzburg,* 993 F.Supp. at 1017 ("[Plaintiff] ... fails to produce evidence that competition has been threatened or that patient choice options have diminished due to [d]efendants' conduct.").

To support her proposition that defendants' actions injured patients, plaintiff cites her own sworn declaration, which contains only her own conclusory and unsupported allegations, and the declarations of 35 patients, each stating that the patient would like plaintiff to be able to treat him or her at BSCH. (*See* Pl. R. 56.1 Stmt. ¶¶ 16, 20.) Plaintiff cannot rely on her own conclusory allegations to prove factual matters on summary judgment. *See Stroud v. New York City,* 374 F.Supp.2d 341, 349 (S.D.N.Y.2005) (quoting *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004)) (On a motion for summary judgment "the nonmoving party 'may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence' in support of its factual assertions."). Furthermore, the stated preference for plaintiff of 35 patients is not probative as to whether patients have received inferior emergency cardiology services because plaintiff no

---

19. We presume that plaintiff intends to define the relevant service market as *emergency* cardiac services. She has presented no evidence to indicate that individuals within her defined geographic market would not travel to a hospital other than BSCH for non-emergency cardiac services and, thus, she has not demonstrated that the provision of such services at BSCH are not reasonably interchangeable with similar services provided at other hospitals. Rather, plaintiff argues that the relevant market is Port Jervis and the surrounding geographic area "stretching outward to a distance halfway between the nearest hospital in any direction," because "obtaining medical care within the first 10 minutes of a life-threatening event is critical for the recovery prospects" and because when an individual

suffers a stroke, he or she is taken to the nearest hospital. (Pl. Mem. Opp. Summ. J. at 15–16.) Thus, it appears that she intends to argue that, because of the need for expediency, emergency cardiac services at BSCH are not reasonably interchangeable with similar services at a hospital located farther away.

To the extent that plaintiff argues that individuals that are taken to the nearest hospital for emergency services are entitled to be seen by their physician of choice (in this case, plaintiff), we reject this proposition. A contrary finding would lead to the absurd result that any physician would be entitled to admitting privileges at any hospital located anywhere merely because that physician's patients *may* require emergency services at that hospital at some point in the future.

longer has admitting privileges at BSCH. Although some of plaintiff's patients may be upset that they cannot see plaintiff as their cardiologist when, in the event of an emergency, they are taken to their local hospital, plaintiff has not demonstrated that they are denied specialized medical services or that they receive inferior medical services because plaintiff does not have admitting privileges at BSCH.

Plaintiff also argues that "patients at BSCH are being deprived of ... quality of care ... by reason of the [d]efendants' activities in silencing ... [p]laintiff ... and not doing anything to correct the adverse conditions observed by ... [p]laintiff." (Pl. Sur–Reply Mem. Opp. Summ. J. at 8.) She fails to adequately support these propositions. She has not submitted any evidence, beyond her own conclusory allegations, that her complaints about quality of care were valid or that defendants failed to take any action in response to her complaints. Rather, the undisputed facts indicate that the Hospital did take action in response to her complaints, though not the action that plaintiff desired: the Hospital's Physician Quality Assurance Committee initiated an investigation and reviewed patient charts wherein she had documented her complaints. Moreover, even if plaintiff had proffered evidence to support her propositions, her concerns regarding conditions at BSCH are irrelevant to the question of whether the quality of care at BSCH diminished because of plaintiff's alleged exclusion from competition. *See*

*Ginzburg,* 993 F.Supp. at 1019 (Rejecting a similar argument and noting that "according to [plaintiff], the level of care ... did not improve even in spite of her efforts. In fact, [plaintiff] claims that most of her verbal complaints were ignored and her formal written complaints were whitewashed, announced to be without merit, and used to trigger a peer review action against her.") (internal quotation marks and citation omitted).

Plaintiff also argues that patients have suffered "lower quality of medical care" because Kaufmann, and not plaintiff, read the echo tests of plaintiff's patients and that Kaufmann is "destroying competition ... through his monopolization of echo[ ] test revenues." (Pl. Sur–Reply Mem. Opp. Summ. J. at 9.) Plaintiff has not submitted any competent evidence to support these arguments. She has not introduced any evidence that Kaufmann is less capable than she is with respect to reading of echo tests. Nor has she directed the Court to any evidence, beyond her own conclusory allegations, that any of her patients suffered as a result of the fact that Kaufmann read their echo tests.[20] (*See* Pl. R. 56.1 Stmt. ¶¶ 21–22.)

In addition to an absence of any evidence that any patient suffered inferior care because of defendants' allegedly anticompetitive conduct, plaintiff also has not demonstrated that consumer choice—in this context, patients' choice of physician—has diminished due to that conduct.[21]

---

20. Plaintiff also submits her own sworn statement that Kaufmann ignored her suggestions to upgrade the "equipment and cardiology services at BSCH" and that after she left, "various specialized equipment for cardiac patients remains unused, to the detriment of the cardiac patients at BSCH." (Mahmud Decl. ¶ 80.) Plaintiff's own speculation as to the impact of the level of equipment and cardiology services on patient care after she left BSCH is insufficient to create a genuine

issue of fact as to whether patients were harmed by defendants' alleged actions.

21. Plaintiff provides her sworn statement that "[t]he ability of ... patients [ ] in the market area to select from competing providers of ... specialized services has been severely limited, if not eliminated, by [defendants'] alleged activities." (Mahmud Decl. ¶ 62.) This general conclusory allegation is insufficient to create a genuine issue of fact as to whether patient choice was in fact reduced.

Rather, the record reflects that BSCH has employed four new cardiologists since 2002[22] and, since 1982, no cardiologist who has applied for privileges to BSCH has been denied. *See Ginzburg*, 993 F.Supp. at 1017 ("Even absent ... [the plaintiff]'s options to practice at other hospitals, [the plaintiff] still fails to produce evidence that competition has been threatened or that patient choice options have diminished due to [the d]efendants' conduct," noting that the defendants have "expanded their practices ... by hiring associates."); *Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989, 998 (N.D.Ga.1992) (Although the plaintiff was no longer able to practice at the defendant's hospital, the evidence showed that the hospital added more doctors to its staff after the plaintiff left, thus proving that "patients have more of a choice concerning which doctor to visit and that [the hospital] is a more competitive hospital with the addition of the new doctors"). The evidence also indicates that plaintiff has admitting privileges at three other hospitals, that she continues to maintain a cardiology practice in Port Jervis and that Tatelbaum has offered her a position with his practice group.[23] Therefore, to the extent that physician choice has been reduced for those patients that wish to see plaintiff as their cardiologist, those patients may still be able to see her, to the extent that they can travel and do not require emergency services.

Finally, although plaintiff may have established that defendants' conduct caused various injuries to herself personally, such as loss of patients' business and potential revenues from reading echo tests, this is insufficient to demonstrate that competition as a whole was harmed. *See Capital Imaging Assocs.*, 996 F.2d at 547 (Affirm-ing that summary judgment was warranted on Sherman Act claim brought by plaintiff, a radiology practice that had been excluded from providing services to patients of defendants' health care provider, noting that "[plaintiff]'s position is simply that it has been harmed as an individual competitor. It has not shown that defendants' activities have had any adverse impact on price, quality, or output of medical services offered to consumers in the relevant market."); *Purgess v. Sharrock*, 1992 WL 349683, at *2 (S.D.N.Y. Nov.9, 1992) (finding no antitrust injury where plaintiff, an anesthesiologist who was fired by a hospital, "merely asserts injury to himself as a competitor of [the hospital] and its anesthesiologists"); *Ginzburg*, 993 F.Supp. at 1019 ("Antitrust concerns ... are not implicated by an individual physician's loss of income or patient referrals.").

Therefore, summary judgment is granted with respect to plaintiff's antitrust claims because plaintiff has failed to proffer any evidence of the relevant market alleged in her Amended Complaint and because, even if she had established the relevant market, she has failed to raise a genuine issue of material fact as to the existence of any antitrust injury.

### III. Interference With a Prospective Economic Advantage Claim

■ To maintain an action for tortious interference with a plaintiff's business relations under New York law, the plaintiff must demonstrate that: "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plain-

---

**22.** It appears from the record that plaintiff last worked at BSCH in May 2002, at which point she requested a leave of absence.

**23.** We note that these positions may not permit plaintiff to render emergency cardiac services in the relevant geographic market.

tiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir.1997); *see Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir.2003).

■ Plaintiff alleged in her original Complaint that defendants' actions "were malicious and were solely intended to harm her by interfering with her prospective economic advantage and business relationships, by driving away patients, or forcing patients to consult other doctors with Hospital privileges, through unlawful and/or improper means." (Complt.¶ 51.) After defendants moved to dismiss this claim, in part on the ground that plaintiff had failed to allege some particular, existing business relationship with which the defendants interfered, (Defs. Mem. Supp. Mot. Dismiss (Document # 9) at 16–18), plaintiff amended her Complaint to add the names of seven patients with whom she had a relationship and with which relationships defendants allegedly interfered, (Am.Complt.¶ 51).[24] In her motion papers, plaintiff now contends that defendants' activities constituted an unlawful interference with plaintiff's relationship with ORMC, with the OPMC and CPH, with BSCH, and with "all hospitals to which [plaintiff] may apply for admitting privileges for the rest of her professional life." (Pl. Mem. Opp. Summ. J. at 18–19.) Thus, it appears that plaintiff has abandoned her prior theory of liability—that defendants interfered with her relationships with patients—and now attempts to base her claim on defendants' alleged interference with her relationships with the two medical committees and various identified and unidentified hospitals. As discussed above,

we will not consider, on a motion for summary judgment, allegations that were not pled in the Complaint and are raised for the first time in opposition to a motion for summary judgment. *Alali*, 2008 WL 4700431, *3 n. 6. Therefore, the allegations in the Amended Complaint govern for purposes of this analysis.

As set forth in *Mahmud I*, "[t]o claim tort[i]ous interference with a prospective business relationship ... a plaintiff must specify some particular, existing relationship through which plaintiff would have done business but for the allegedly tort[i]ous behavior." 454 F.Supp.2d at 162 (internal quotation marks and citation omitted). Furthermore, "[t]o satisfy the second requirement, ... the defendant must direct some activities toward the party and convince the third party not to enter into the business relationship with plaintiff." *Id.* (internal quotation marks and citation omitted). Defendants contend that "[w]hile certain of the [d]efendants had limited contact with or provided professional services to some of [plaintiff]'s patients, those contacts in no way involved any conversations regarding [plaintiff], and ... [d]efendants made no statements to any patient about [plaintiff], derogatory or otherwise." (Defs. Mem. Supp. Summ. J. at 18.) In support of this statement, defendants introduce the declarations of each of the defendants: Kaufmann, Auerbach, Brooks, Shah and Brody. (*See generally*, Defs. R. 56.1 Stmt.)

Plaintiff has not submitted any evidence that any of the defendants directed any activity toward any of her patients, which activity would constitute an attempt to convince the patients not to continue a particular, existing relationship with plaintiff—not even toward the patients

---

**24.** Plaintiff explained in her papers opposing defendants' motion to dismiss that "[r]ather than debate the necessity of so pleading, [p]laintiff has, in her Amended Complaint ...,

identified half-a-dozen patients with whom [d]efendants interfered." (Pl. Mem. Opp. Mot. Dismiss (Document # 12).)

named in her Amended Complaint.[25] She offers her own conclusory allegation that defendants "influenced the [H]ospital to fail and refuse to make a new contract with [her] ... as seen from documents produced by ORMC and ... [d]efendants, which ... caused some of [her] patients to seek and receive cardiac treatment from ... Kaufmann and other cardiologists with admitting privileges at BSCH." (Mahmud Decl. ¶ 50.) Even leaving aside plaintiff's lack of personal knowledge about these events and the validity of her inferences regarding the documents produced by ORMC and defendants, any indirect activity on the part of defendants directed toward the Hospital that resulted in any of plaintiff's patients seeking care from other physicians does not satisfy the second requirement of a tortious interference with business relations claim, that is, that the defendant "direct some activities toward the [patient] and convince the [patient] not to enter the business relationship with plaintiff." *Mahmud I*, 454 F.Supp.2d at 162 (internal quotation marks and citation omitted). The undisputed facts indicate that none of the defendants interfered with any of plaintiff's relationships with her patients in this manner. On this basis alone, defendants are entitled to summary judgment on plaintiff's tortious interference claim. *See Franzon v. Massena Mem'l Hosp.*, 89 F.Supp.2d 270, 281 (N.D.N.Y.2000) (Granting summary judgment on plaintiff-physician's tortious interference with business relations claim where, although plaintiff alleged that defendant "made de-

famatory statements to [p]laintiff's patients, prospective patients, and the community at large regarding [plaintiff's] ability to practice medicine," plaintiff failed "to point to any business relationships with which [defendant] interfered.").

Even if we did accept the theory of liability that plaintiff improperly attempts to set forth in her opposition papers, defendants would still be entitled to summary judgment on plaintiff's claim of tortious interference with prospective economic advantage. First, defendants' interference with "all hospitals to which [plaintiff] may apply for admitting privileges for the rest of her professional life," (Pl. Mem. Opp. Summ. J. at 18), cannot be the grounds for liability under this cause of action because such potential relationships are neither "particular" nor "existing." *Mahmud I*, 454 F.Supp.2d at 162. Furthermore, that plaintiff has obtained admitting privileges at three other hospitals since she left BSCH undermines her claim that her ability to obtain such privileges has been injured. (Mahmud Decl. ¶ 30.)

 Second, plaintiff's claim that defendants somehow tortiously interfered with her relationship with BSCH, setting aside the fact that plaintiff does not make this allegation in her Amended Complaint, must fail as well. She has not submitted any evidence that any defendant directed any activity toward the Board of Directors, which evidently makes determinations regarding admitting privileges, in an effort to interfere with plaintiff's relationship with BSCH.[26] However, she does contend,

---

**25.** Plaintiff states that her claims that defendants made derogatory statements about her to her patients "are no longer part of the case." (Pl. Mem. Opp. Summ. J. at 12.) She does not argue that defendants interfered with her relationships with patients in some other manner. Thus, it appears that she has abandoned entirely this theory of liability and has not submitted any evidence in support of

the claim as alleged in her Amended Complaint.

**26.** We note that, although BSCH suspended plaintiff's admitting privileges, nothing in the record indicates that it even rejected an application by plaintiff to renew her privileges. Rather, the record indicates that plaintiff took a leave of absence in May 2002, during which

relying on her own sworn statements, that defendants had "*de facto* control of who is permitted to admit patients at BSCH." (*Id.* ¶ 33.) "[A] plaintiff cannot maintain a tortious interference [claim] against her employer.... An employer cannot be liable for interfering with its own relationship with its employee." *Malec v. Metro. Life Ins. Co.,* 2007 WL 969086, at *25 (W.D.N.Y. Mar.30, 2007). Furthermore, "[a] tortious interference claim may not lie against agents of the employer absent a showing that they acted outside the scope of their authority." *Id.* Plaintiff neither has introduced any evidence, nor has she argued, that any defendant acted outside the scope of his or her authority.[27] Therefore, whether defendants were acting as BSCH, plaintiff's "employer," through their alleged "*de facto* control" of the Hospital, or whether they were acting as agents of BSCH, plaintiff's claim must fail.

Third, plaintiff's claim that defendants tortiously interfered with her relationship with ORMC also fails. Plaintiff does not introduce any evidence, beyond her own conclusory allegations, that any of the defendants, knowing of her application for privileges at ORMC, *intentionally* inter-

fered with it, either by reviewing her performance at BSCH and thereby creating a "paper trail" or by contacting ORMC directly. On the contrary, the record reflects that defendants took precautions to protect plaintiff. For example, during the review of plaintiff at BSCH, defendants gave her opportunities to explain herself and encouraged her to do so (*see, e.g.,* Lasch Decl., Ex. A at 167 (11/30/01 Brooks Ltr.)); they gave her a second chance to undergo the evaluation recommended by the CPH after she first refused to undergo the same evaluation (Person Decl., Ex. P at 20 (2/21/02 Kaufmann Ltr.)); and they did not provide ORMC with any information about plaintiff's tenure at BSCH except in response to a request for information made pursuant to state law and after plaintiff specifically requested that the information be disclosed (Lasch Decl., Ex. A at 270 (6/6/2003 Ltr.), 281 (8/14/03 Mahmud Ltr.); Person Decl., Ex. P at 67 (8/27/2003 Auerbach Ltr.)). Plaintiff has not created a genuine issue of fact as to the third and fourth elements of a tortious interference claim.[28]

In conclusion, defendants are entitled to summary judgment on plaintiff's claim for

---

time her application to renew her privileges was deferred indefinitely. Brunelle contacted her in November 2002 to inquire as to whether she wanted to pursue her application, to which plaintiff responded that she did not. However, plaintiff states that her reason for not renewing her privileges was that she felt "traumatized" by the physicians that comprise the MEC. Although plaintiff technically was not denied privileges, she claims that defendants' activities prohibited her from seeking to renew them. We need not decide here whether this distinction has significance for a tortious interference claim.

27. Although plaintiff contends that defendants "deviated from their custom and practice of dealing with physician issues in executive session without any writings to record the events," (Pl. R. 56.1 Stmt. at 11), this proposition is not supported by the record. Even if

we accept the proposition as true, it would not establish that defendants were acting outside the scope of their authority as agents for BSCH.

28. Plaintiff argues that defendants interfered with her relationship with the OPMC and the CPH. Plaintiff has not identified any "business relationship" with the CPH or the OPMC that was injured. These two entities are committees and plaintiff has not demonstrated any potential for economic advantage with either. Furthermore, neither party addresses whether plaintiff's relationship with either of these committees has been injured by any action by defendants. Rather, it appears that the OPMC closed its investigation of plaintiff's case without any adverse finding and the CPH "found no basis to take or recommend any action against [plaintiff]." (Mahmud Decl. ¶ 47.)

tortious interference with prospective economic advantage because plaintiff has submitted no evidence that any of the defendants directed any activity toward her patients in order to convince them to discontinue their relationships with her. Nor has plaintiff proffered sufficient evidence to indicate that defendants tortiously interfered with her relationship with any hospital or committee, to the extent that plaintiff makes this claim.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (Doc. # 29) is granted in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendants. This action is dismissed with prejudice and without costs or attorneys' fees.

SO ORDERED.